C. CAPERS SMITH v. STATE OF NORTH CAROLINA; JAMES E. HOLSHOUSER, GOVERNOR; JOE K. BYRD, CHAIRMAN, STATE BOARD OF MENTAL HEALTH; RALPH SCOTT, ADVISORY BUDGET COMMISSION; DAVID T. FLAHERTY, SECRETARY OF HUMAN RESOURCES; N. P. ZARZAR, COMMISSIONER, MENTAL HEALTH; TREVOR G. WILLIAMS, SUPERINTENDENT, BROUGHTON HOSPITAL

No. 70

(Filed 2 March 1976)

1. **State § 4— action for breach of employment contract — plaintiff as State employee**

    By virtue of N. C. Sess. Laws 1963, Ch. 1166, §§ 3, 4, plaintiff, who was appointed by the Governor as Superintendent of Broughton Hospital, one of the State's hospitals for the mentally disordered, was an employee of the State, and at the time of his appointment, the State employed him as Superintendent of the Hospital for a period of six years, provided only his employment not be earlier terminated for cause.

2. **State § 4— contract by State — implied consent to be sued — no sovereign immunity in contract actions**

    Whenever the State of N. C., through its authorized officers and agencies, enters into a valid contract, the State implicitly consents to be sued for damages on the contract in the event it breaches the contract; thus, in the present case and in causes of action on contract arising after the filing date of this opinion, 2 March 1976, the doctrine of sovereign immunity will not be a defense to the State, and the State will occupy the same position as any other litigant.

Smith v. State

3. **State § 4— action for breach of contract — no sovereign immunity — no execution against State**

Since plaintiff's suit is predicated upon a contract which was fully authorized by the State legislature, the trial court properly denied the State's motion to dismiss on the ground of sovereign immunity; however, if plaintiff is successful in establishing his claim against the State, he cannot obtain execution to enforce the judgment.

4. **Constitutional Law § 5; Courts § 2; State § 3— claims against State — no original jurisdiction in Supreme Court — jurisdiction constitutionally defined**

The N. C. Constitution no longer gives the Supreme Court original jurisdiction over claims against the State, nor is such jurisdiction given the Supreme Court by G.S. 7A-25, since the General Assembly intended that N. C. Sess. Laws, Ch. 1258, § 5 (1969) should repeal that statute; moreover, had it not been repealed, G.S. 7A-25 would be unconstitutional, since it is a well-established principle of constitutional law that when the jurisdiction of a particular court is constitutionally defined, the Legislature cannot by statute restrict or enlarge that jurisdiction unless authorized to do so by the Constitution.

5. **Public Officers § 9— breach of contract — sufficiency of complaint**

In plaintiff's action against defendant public officers arising from plaintiff's allegedly wrongful discharge from employment, the trial court properly denied the individual defendants' motion to dismiss since it does not appear beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief against the individual defendants.

6. **Public Officers § 9; State § 4— breach of contract — action against State and officials — State alone liable**

When an action for breach of contract to recover lost benefits is brought against the State and the officials who acted for the State in the transaction which is the basis for the suit, the State alone will be liable for a breach of the contract; in such case, to hold the officials liable, a plaintiff must state and prove more than a claim for breach of contract.

7. **Venue § 4— action against public officers — county where action arose proper — action against State — county of plaintiff's residence proper**

Pursuant to G.S. 1-77(2), plaintiff was entitled to bring his action against defendant public officers in Burke County, since plaintiff's allegedly wrongful discharge from employment occurred in that county and any potential cause of action arose there; however, as to plaintiff's action against the State, G.S. 1-82 was applicable, and plaintiff could bring his action in Burke County, the county of his residence.

Justice LAKE dissenting.

APPEAL under G.S. 7A-30(2) from the decision of the Court of Appeals reported in 23 N.C. App. 423, 209 S.E. 2d

336 (1974), which affirmed an order of *Ervin, J.*, denying defendants' motion to dismiss and to change venue, entered at the 20 October 1973 Session of BURKE Superior Court, docketed and argued as Case No. 61 at the Spring Term 1975.

Plaintiff, C. Capers Smith, a medical doctor, with approved training and experience in psychiatry and duly licensed in North Carolina, instituted this action on 24 July 1973 against the State of North Carolina and the following State officers in their official and individual capacity: James E. Holshouser, the present Governor of North Carolina; Joe K. Byrd, Chairman of the State Board of Mental Health; Ralph Scott, legislative member of the Advisory Budget Commission; David Flaherty, Secretary of the Department of Human Resources; N. P. Zarzar, State Commissioner of Mental Health; and Dr. Trevor G. Williams, Acting Superintendent of Broughton Hospital and former Western Regional Commissioner of Mental Health. Plaintiff alleges that he is entitled to recover damages against both the State and the individual defendants for his wrongful discharge as Superintendent of Broughton Hospital.

In summary the complaint alleges (enumeration ours):

1. On or about 1 October 1970 Governor Robert W. Scott, who was then Governor of the State, confirmed plaintiff's appointment as Superintendent of Broughton Hospital, one of the State's hospitals for the mentally disordered. The appointment made in accordance with G.S. § 122-25 (1964) (repealed 1 July 1973 by N. C. Sess. Laws, Ch. 476, § 133 (1973)), was for a term of six years. Plaintiff accepted the appointment and performed his duties as superintendent "properly, efficiently and according to the contract" until 18 April 1973, when he was discharged without cause and without a hearing.

2. On 18 April 1973 Dr. Trevor Williams, Western Regional Commissioner of Mental Health, demanded that plaintiff release to him "the tape recorder cassettes" allegedly made during an official credentials committee meeting called by plaintiff as superintendent of Broughton Hospital. Plaintiff, at that time, did not have the cassettes and therefore could not release them to Dr. Williams. Notwithstanding, because of his failure to produce the tapes, Dr. Williams summarily discharged plaintiff from his position although plaintiff's contract with the State gave him three years and five months additional employment. Plaintiff's removal as superintendent was thereafter approved

by Dr. N. P. Zarzar, State Commissioner of Mental Health; David Flaherty, Secretary of the Department of Human Resources; and Governor Holshouser.

3. Plaintiff's dismissal was "without due cause or authority"; "against the statute"; "without any hearing whatsoever and without due process." He was dismissed "in a manner of harassment, embarrassment, with widely publicized news coverage and under circumstances designed to embarrass and humiliate plaintiff." Defendants' actions deprived plaintiff "of his livelihood and right to employment" and "resulted in his professional defamation." Plaintiff's age and the prejudicial circumstances under which he was released will render it difficult if not impossible for him to obtain other employment of a comparable nature.

4. After his dismissal, plaintiff, pursuant to G.S. 122-1.1 (1964) (repealed 1 July 1973 by N. C. Sess. Laws, Ch. 476, § 133 (1973)), served upon the Governor and the Chairman of the Advisory Budget Commission a claim for severance pay. When no action was taken on his claim, plaintiff filed this action.

Plaintiff's prayer for relief is that he recover from "the defendants jointly and severally" the amount of $250,000.

On 21 August 1973 all defendants except Joe K. Byrd, pursuant to G.S. § 1A-1, Rule 12(b), moved to dismiss the action on the grounds that sovereign immunity barred the suit against the State and against the individual defendants since they were acting in their official capacities. In the event the motion to dismiss was denied, pursuant to G.S. § 1-77 and G.S. § 1-83(2), defendants moved to change the venue from Burke County to Wake County on the grounds (1) the discharge occurred in Wake and, the action being against public officers, the case properly should be tried in Wake; and (2) the convenience of witnesses and the ends of justice would be promoted by removing the case to Wake County.

Defendant Joe K. Byrd filed a separate answer, affidavit, and response to the motion to dismiss in which he opposed the two motions made by the other defendants.

On 20 October 1973 Judge Ervin denied the motions to dismiss and to change the venue. The moving defendants' petition for certiorari to the North Carolina Court of Appeals was

Smith v. State

allowed 16 November 1973. The Court of Appeals, Judge Baley dissenting, affirmed the trial judge's rulings, and the moving defendants appealed to this Court as a matter of right.

*Hatch, Sitton and Powell and James J. Booker for plaintiff appellee.*

*Blanchard, Tucker, Denson & Cline for Joe K. Byrd, defendant appellee.*

*James H. Carson, Jr., Attorney General, and Parks H. Icenhour, Assistant Attorney General, for defendant appellants.*

SHARP, Chief Justice.

Appellants' first assignment of error challenges the trial court's denial of their motion to dismiss made on the grounds (1) that the State of North Carolina is the real party in interest, and (2) that its sovereign immunity bars plaintiff's action against both the State and the individual defendants, who were State officials acting within the scope of their official authority and in the exercise of the discretion invested in them by virtue of their respective positions.

In determining whether the motion to dismiss was properly denied we first consider whether the doctrine of sovereign immunity precludes plaintiff's action against the State itself without reference to its application to the individual defendants. As to them different considerations are, or may be, involved.

[1] Plaintiff's claim against the State for the salary he alleges he would have earned during the three years and five months of his unexpired term as superintendent of Broughton Hospital, to be tenable, must be based upon status as a State employee under a valid contract of employment. Since the decision in *Mial v. Ellington,* 134 N.C. 131, 149, 46 S.E. 961, 967 (1903), it has been the law of this State that " 'an appointment or election to public office does not establish contract relations between the persons appointed or elected and the State.' " *See* 63 Am. Jur. 2d *Public Officers and Employees* § 10 (1972).

In a sense public office is an employment but, briefly stated, the distinction is this: "[A] position is a public office when it is created by law, with duties cast on the incumbent which involves some portion of the sovereign power and in the

performance of which the public is concerned. . . . " *Id.* at § 11. *See also Bland v. City of Wilmington,* 278 N.C. 657, 180 S.E. 2d 813 (1971); Annot., 140 A.L.R. 1076 (1942).

Plaintiff was appointed superintendent pursuant to N. C. Sess. Laws 1963, ch. 1166, § 4 (codified as G.S. § 122-25 (1964)) (repealed by Sess. Laws 1973, ch. 476, § 133). In pertinent part this enactment provided: "The Commissioner of Mental Health with the approval of the State Board of Mental Health, shall appoint a medical superintendent for each hospital. The medical superintendent shall be a medical doctor duly licensed in North Carolina with approved training and experience in psychiatry. The appointment shall be for a term of six (6) years. . . . "

In specifying the powers and duties of the State Board of Mental Health "a policy-making body within and for the State Department of Health," N. C. Sess. Laws 1963, ch. 1166, § 3 (codified as G.S. 122-1.1 (1964)) (repealed by Sess. Laws 1973, ch. 476, § 133), provided, *inter alia: "The Board shall determine policies and adopt necessary rules and regulations governing the operation of the State Department of Mental Health and the employment of professional and staff personnel.* The State Board of Mental Health by and with the approval of the Governor, may terminate for cause the services of any *employee* appointed for a specific length of time. In the event of any such termination, severance pay shall be adjusted by the Governor and the Advisory Budget Commission." (Emphasis added.)

The foregoing statutes clearly make the medical superintendent of a state hospital a state employee. Thus, simply stated, plaintiff was a medical expert employed to supervise a psychiatric hospital owned and operated by the State. He had no duties which required or permitted him to exercise any portion of the sovereign power of the State. It was the State Board of Mental Health, "a policy-making body within and for the State Department of Mental Health," which exercised the State's sovereign power by formulating the policies and guidelines for the operation of its mental hospital. These policies determined, *inter alia,* the admission of patients and the extent and duration of their treatment—matters of public concern. The State Board was also authorized to enact ordinances for the regulation and deportment of persons in the buildings and grounds of the mental hospitals. G.S. § 122-16 (1974). Plaintiff,

as superintendent of Broughton Hospital, was subordinate to the Board. With the consent of the Governor, the Board could terminate his employment only for cause since he was an employee appointed for a specific length of time. Plaintiff's duties were to implement the Board's directives and policies, and to make those administrative and professional decisions which are daily required of the superintendent of a mental hospital.

The intent of the legislature to give the medical superintendents of the State's mental hospitals the status of employees, as well as the reasons for such designation, is apparent. The proper operation of a mental hospital requires a superintendent who is a medical expert with administrative ability and whose tenure will be unaffected by political changes. Thus, the superintendents themselves were given no policy-making authority. That was reposed in the State Board, the members of which were appointees of the Governor. Divorced from political considerations, the superintendents were to provide the expertise and continuity necessary to insure the continued efficient operation of the hospitals notwithstanding changes in the Executive Department of the State's government.

We hold, therefore, by reason of the statutes cited above that (1) plaintiff was an employee of the State and (2) at the time of his appointment the State employed him as superintendent of Broughton Hospital for a period of six years, provided only his employment not be earlier terminated for cause.

Here it is pertinent to note that N. C. Sess. Laws 1963, ch. 1166, § 13 (codified as G.S. § 122-31 (1964)) provided that the State Board of Mental Health shall fix the salaries and compensation of the superintendents of the State hospitals, and that "[t]he salaries shall not be diminished during the term of the incumbents." The provision quoted above was carried forward when G.S. § 122-31 was rewritten by N. C. Sess. Laws 1973, ch. 673, § 12 (now codified as G.S. § 122-31 (1974)).

Having determined that a contract existed between plaintiff and the State, the question remains whether the State is immune from an action for damages for the alleged breach of that contract.

The doctrine of sovereign immunity—that the State cannot be sued without its consent—has long been the law in North Carolina. The doctrine has proscribed both contract and tort actions against the state and its administrative agencies, as

well as suits to prevent a State officer or Commission from performing official duties or to control the exercise of judgment on the part of State officers or agencies. *See Lewis v. White,* 287 N.C. 625, 216 S.E. 2d 134 (1975) ; *Orange County v. Heath,* 282 N.C. 292, 192 S.E. 2d 308 (1972) ; *Steelman v. City of New Bern,* 279 N.C. 589, 184 S.E. 2d 239 (1971) ; *General Elec. Co. v. Turner,* 275 N.C. 493, 168 S.E. 2d 385 (1969) ; *Nello L. Teer Co. v. Highway Comm.,* 265 N.C. 1, 143 S.E. 2d 247 (1965) ; *Shingleton v. State,* 260 N.C. 451, 133 S.E. 2d 183 (1963) ; *Great Am. Ins. Co. v. Gold,* 254 N.C. 168, 118 S.E. 2d 792 (1961) ; *Pharr v. Garibaldi,* 252 N.C. 803, 115 S.E. 2d 18 (1960) ; *Floyd v. Highway Comm.,* 241 N.C. 461, 85 S.E. 2d 703 (1955) ; *Nello L. Teer Co. v. Jordan,* 232 N.C. 48, 59 S.E. 2d 359 (1950) ; *Schloss v. Highway Comm.,* 230 N.C. 489, 53 S.E. 2d 517 (1949) ; *Kirby v. Stokes County Board of Education,* 230 N.C. 619, 55 S.E. 2d 322 (1949) ; *Prudential Insurance Co. of America v. Unemployment Compensation Comm.,* 217 N.C. 495, 8 S.E. 2d 619 (1940) ; *Vinson v. O'Berry,* 209 N.C. 287, 183 S.E. 423 (1936) ; *Carpenter v. Atlanta & C. A. L. Ry.,* 184 N.C. 400, 114 S.E. 693 (1922) ; *Moody v. State Prison,* 128 N.C. 12, 38 S.E. 131 (1901) ; *Clodfelter v. State,* 86 N.C. 52 (1882) ; 7 Strong's N. C. Index 2d, § 4 (1968).

The traditional rules governing the State's liability on its contracts and its immunity to suits are stated as follows in 72 Am. Jur. 2d, *States, Etc.* (1974).

"The rights and responsibilities of a state under an ordinary business contract are, with few exceptions, the same as those of individuals. Although it cannot be sued without its consent, the state, when making a contract with an individual, is liable for a breach of its agreement in like manner as an individual contractor. And while it may refuse to respond in damages, and leave a claimant without any remedy, as it may refuse to pay its bonds, the obligation remains. No legislative fiat can destroy or impair that. In order to impose a contractual liability on the state, there must be a contract obligation on its part. It is not bound by a contract entered into by its officers without authority." *Id.* § 88.

"As to its contract, the State should be held to the same rules and principles of construction and application of contract provisions as govern private persons and corporations in contracting with each other. But aside from the fact that a contract of the State must ordinarily rest upon some legislative enact-

Smith v. State

ment and in this respect is distinguished from contracts with individuals, there is another essential and far-reaching difference between the contracts of citizens and those of sovereigns, not, indeed, as to the meaning and effect of the contract itself, but as to the capacity of the sovereign to defeat the enforcement of its contract. The one may defeat enforcement, but the other cannot. This result flows from the established principle that a state cannot be sued. The legislature has the ability to avoid payment of the obligations of the state by a failure or refusal to make the necessary appropriation, although that body cannot impair the obligation of the contract and creditors accepting obligations of the state are bound to know that they cannot enforce their claims against the state directly or against its officers when no appropriation has been made for their payment. Unless there is an appropriation, courts have no power to enforce a contract of a state, even though they do not doubt its validity." *Id.* § 73.

The substance of the foregoing statement is (1) that, although the state is fully obligated on its contracts, the doctrine of sovereign immunity prevents a suit to enforce its obligation unless the state has waived the immunity; and (2) that any judgment against the state will be uncollectible unless the legislature appropriates funds which can be used to pay the obligation.

The cases previously cited herein evidence this Court's strict adherence to the doctrine of sovereign immunity. Yet in *Lyons & Sons, Inc. v. Board of Education,* 238 N.C. 24, 76 S.E. 2d 553, decided 12 June 1953, in writing the opinion for the Court, Justice Parker (later Chief Justice) noted that the exemption of the sovereign from suit involves hardship where consent has been withheld and also that "the current trend of legislative policy and of judicial thought is toward the abandonment of the monarchistic doctrine of governmental immunity." *Id.* at 27, 76 S.E. 2d at 555.

In *Steelman v. City of New Bern, supra,* a wrongful death case decided 10 November 1971, the negligence of the defendant municipality was so gross, and the righteousness of plaintiff's claim so apparent, that we reexamined the doctrine of governmental immunity which relieved municipalities of tort liability. Justice Moore, writing the opinion for the Court, reviewed the history of the doctrine. In doing so he noted that (1) This "judge-made doctrine" was first adopted by this Court in 1889

in *Moffitt v. Asheville,* 103 N.C. 237, 9 S.E. 695, earlier North Carolina cases having specifically rejected it. (2) For many years the doctrine has been under attack. *See* 5 Wake Forest Intra. L. Rev. 383 (1969); 1964 Duke L. J. 888 (1964); 41 N. C. L. Rev. 290 (1963). (3) In 1957 the Supreme Court of Florida broke the states' solid ranks by holding that sovereign immunity "had been erroneously transposed into our democratic system and that the time had arrived to declare this doctrine anachronistic not only to our system of justice, but to our traditional concepts of democratic government." (4) "Since 1957 fifteen other jurisdictions . . . had overruled or greatly modified the immunization of muncipalities from tort liability."

We suggested in *Steelman v. City of New Bern,* "It may well be that the logic of the doctrine of sovereign immunity is unsound and that the reasons which led to its adoption are not as forceful today as they were when it was adopted." *Id.* at 595; 184 S.E. 2d at 243. However, we declined to abrogate a municipality's governmental immunity from tort liability for the negligence of its agents acting in the scope of their authority. The rationale was that, albeit the doctrine was "judge-made," the General Assembly had recognized it as the public policy of the State by enacting legislation which permitted municipalities and other governmental bodies to purchase liability insurance and thereby waive their immunity to the extent of the amount of insurance so obtained. *Id.* at 594-96, 184 S.E. 2d at 242-43.

The arguments for and against sovereign immunity are usually set out in opinions involving tort actions, but they have been applied indiscriminately to actions to enforce government contracts. Professor Kenneth Culp Davis, author of a multivolume treatise on administrative law and Administrative Law Text (1972), is perhaps the best known and most outspoken critic of sovereign immunity. His views are summarized in a publication of The National Association of Attorneys General, *Sovereign Immunity: The Liability of Government and its Officials,* January 1975 at p. 17 as follows:

"Professor Davis notes that the following policy grounds are usually offered for immunity: a need to prevent the diversion of public funds to compensate for private purposes; a need to avoid disruption of public service and safety; a need to prevent governmental involvement in endless embarrassments, difficulties and losses subversive to the public interest; and the nonprofit nature of government should be reflected in non-

liability. Balanced against these policy grounds, according to Davis, are the following considerations which tend to support governmental liability: since the public purpose involves injury-producing activity, injuries should be viewed as an activity cost which must be met in the furtherance of public enterprise; there is no control of government activity involved in the typical law suit; it is better to distribute the cost of government caused injuries among the beneficiaries of government than entirely on the hapless victims; although the government does not profit from its activities, the taxpayers do, so the taxpayers should bear the cost of governmental tort liability." *See also* K. Davis, Administrative Law Text, Ch. 27 (1972). For a full discussion of the provisions and consequences of sovereign immunity as it applies to governmental liability for tort see W. Prosser, Handbook of the Law of Torts, § 131 (4th Ed. 1971).

Recognizing the validity of many of the arguments against sovereign immunity and that it often results in injustice, Congress and a number of state legislatures (including North Carolina's) have enacted Tort Claims Acts which authorizes suits for certain torts. In addition, the courts of at least twenty-four states have now judicially abrogated or otherwise modified the doctrine of sovereign immunity as it relates to tort actions against the state. *See Steelman v. City of New Bern, supra* at 593-94, 184 S.E. 2d at 242, and NAAG at 26-32.

Though the law reviews and treatises contain comparatively little discussion of sovereign immunity as it relates to contract actions, there has, nonetheless, been both legislative and judicial activity in that area. For example, 28 U.S.C.A. § 1491 (1973) (commonly known as a part of the Tucker Act) gives the Court of Claims jurisdiction over many contract claims against the federal government. On the state level many courts have judicially abolished the doctrine of sovereign immunity as it applies to contract actions by holding that the state impliedly waives its sovereign immunity whenever it enters into a contract. Among cases supporting this view are the following:

*Souza and McCue Constr. Co. v. Superior Court of San Benito County,* 57 Cal. 2d 508, 20 Cal. Rptr. 634, 370 P. 2d 338 (1962) ; *Ace Flying Service, Inc. v. Colorado Dept. of Agriculture,* 136 Colo. 19, 314 P. 2d 278 (1957) ; *George & Lynch, Inc. v. State,* 57 Del. 158, 197 A. 2d 734 (1964) ; *Regents of the University System of Georgia v. Blanton,* 49 Ga. App. 602 (1934) ; *Grant Constr. Co. v. Burns,* 92 Idaho 408, 443 P. 2d

1005 (1968); *Kersten Company v. Department of Social Services,* 207 N.W. 2d 117 (Iowa 1973); *Humphreys v. J. G. Michael & Co.,* 341 S.W. 2d 229 (Ky. 1960); *W. H. Knapp Co. v. State Highway Dept.,* 311 Mich. 186, 18 N.W. 2d 421 (1945); *V. S. Dicarlo Constr. Co. v. State,* 485 S.W. 2d 52 (Mo. 1972); *Meens v. State Board of Education,* 127 Mont. 515, 267 P. 2d 981 (1954); *Todd v. Board of Educational Lands and Funds,* 154 Nebraska 606, 48 N.W. 2d 706 (1951); *P, T & L Constr. Co. v. Commissioner, Dept. of Trans.,* 55 N.J. 341, 262 A. 2d 195 (1970). *See also,* 72 Am. Jur. 2d *States, Etc.* § 118 (1972). But see *State ex rel Dept. of Highways v. McKnight,* 496 P. 2d 775 (Okla. 1972), where the Oklahoma Supreme Court expressly refused to hold that the State impliedly waived its sovereign immunity by entering into a contract. It adhered to its position that if the doctrine was to be abrogated or relaxed it should be done by the legislature.

The rationale of the foregoing decisions is well stated in the several cases from which excerpts are quoted below.

In *Grant Construction Co. v. Burns, supra,* the plaintiff, a highway contractor, brought an action against the Idaho Board of Highway Directors to recover damages resulting from its breach of a road construction contract. The trial court denied defendant's motion to dismiss based upon sovereign immunity, and, after a trial on the merits, entered judgment in plaintiff's favor. Defendant appealed contending that as a state agency it was immune from liability by reason of the sovereign immunity of the State of Idaho. In affirming the trial court, the Supreme Court of Idaho said:

"We have held that the state cannot be sued without its consent, and that such consent cannot be implied but must be expressly given by constitutional or statutory provisions. (Cites omitted.)

"We have recognized, however, that our constitutional provision prohibiting the taking of property for public use until just compensation has been paid waives the immunity of the state from suit where the state took or damaged the property without first condemning it. (Cites omitted.)

"In the instant action, the state, acting through appellants, entered into a highway construction contract with respondents and allegedly breached the contract to the damage of respond-

ents. Appellants refused to entertain parts of respondents' damage claim, and now assert the defense of sovereign immunity.
.   .   .   .

"The Supreme Court of Indiana in 1891, in *Carr v. State ex rel. Coetlosquet,* 127 Ind. 204, 26 N.E. 778, 779, 11 L.R.A. 370, made the following pertinent assertion:

'In entering into the contract it [the state] laid aside its attributes as a sovereign, and bound itself substantially as one of its citizens does when he enters into a contract. Its contracts are interpreted as the contracts of individuals are, and the law which measures individual rights and responsibilities measures, with few exceptions, those of a state whenever it enters into an ordinary business contract * * * . The principle that a state, in entering into a contract, binds itself substantially as an individual does under similar circumstances, necessarily carries with it the inseparable and subsidiary rule that it abrogates the power to annul or impair its own contract. It cannot be true that a state is bound by a contract, and yet be true that it has power to cast off its obligation and break its faith, since that would invoke the manifest contradiction that a state is bound and yet not bound by its obligation. * * * '

"Courts in other jurisdictions are in accord with the ruling of the Supreme Court of Indiana and have held, in effect, that where the legislature has by statute authorized the state to enter into certain contracts, the state upon entering into such a contract thereby consents to be sued if it breaches the contract to the damage of the other contracting party." (Citations to the Calif., Colo., Ga., Mont., and Neb. decisions cited above omitted.) *Id.* at 412-13, 443 P. 2d at 1009-10.

"We agree with this principle. To deny the right to sue in such a contractual situation would be to deprive the damaged contracting party of property without due process of law. U. S. Const. Amendments 5 and 14. Accordingly, we hold that where, as here, the state has entered into a contract pursuant to legislative authorization, the state has consented to be sued for alleged breaches of its contractual responsibilities and cannot invoke the protection of sovereign immunity."

The Idaho Court also said that the plaintiff's claim for damages was within the contemplation of the legislature and thus implicitly authorized by that body. *Id.* at 413, 443 P. 2d at 1010.

In *Ace Flying Service, Inc. v. Colorado Dept. of Agriculture, supra,* the plaintiff contracted with the defendant to spray a certain number of acres of state land with an insecticide at a stipulated price per acre. The legislature had specifically authorized the Department to enter into the contract. The plaintiff was allowed to spray only a portion of the land specified in the contract before the defendant repudiated it. The trial court dismissed the plaintiff's action for breach of contract on the basis of sovereign immunity. In reversing the dismissal, the Supreme Court of Colorado said:

"All contracts entered into by the State of Colorado or by any of the Departments in its behalf, are required to be awarded, pursuant to statute, to the lowest responsible bidder. Once entered into they are binding upon the state as well as upon the other contracting party. To hold that the state may enter into a contract by which the other party is compelled to expend large sums in acquiring material, machinery and personnel to enable it to perform its obligation, and then arbitrarily repudiate the contract relegating the injured party to the doubtful remedy of appealing to the legislature for justice in the form of a bill for relief, would be to sanction the highest type of governmental tyranny.

"The applicable principle is that when a state enters into authorized contractual relations it thereby waives immunity from suit. This is not a new doctrine in this country." *Id.* at 22, 314 P. 2d at 280.

In *George & Lynch, Inc. v. State, supra,* the State of Delaware brought an action against *George & Lynch, Inc.,* to recover payments improperly made under a road construction contract. The construction company counterclaimed alleging that monies were due it under other road construction contracts with the state. The trial court entered judgment in the state's favor on the counterclaim on the basis of sovereign immunity. On appeal the Supreme Court of Delaware reversed saying: "By 17 Del. C. § 132(b)(9), the State Highway Department is authorized to 'make and enter into any or all contracts, agreements or stipulations.' It must be assumed that the General Assembly, in granting to the State Highway Department the power to contract, intended that it should have power to enter into only valid contracts. A valid contract is one which has mutuality of obligation and remedy between the parties to it. 1 Williston on Contracts (3rd Ed.) § 1. It follows, therefore, that in authoriz-

ing the State Highway Department to enter into valid contracts the General Assembly has necessarily waived the State's immunity to suit for breach by the State of that contract.

"Any other conclusion would ascribe to the General Assembly an intent to profit the State at the expense of its citizens. We are unwilling to assume that the General Assembly intended the State to mislead its citizens into expending large sums to carry out their obligation to the State and, at the same time, deny to them the right to hold the State accountable for its breach of its obligations. To state the proposition is to demonstrate its injustice; indeed, so unjust is it that it might amount to taking the property without due process of law."

   .  .  .  .

"It follows, therefore, that a party contracting with an agency of the State authorized by law to enter into contracts has all the remedies under that contract which any private citizen has against another private citizen, including the right to sue for the breach thereof." *Id.* at 162-63, 197 A. 2d at 736-37.

In *Kersten Co. v. Department of Social Services, supra,* the defendant, a state agency, entered into an oral lease with the plaintiff, who sued for its breach. The defendant moved to dismiss on the ground of governmental immunity, and the trial court denied the motion. On appeal the Supreme Court of Iowa, overruling a prior case which otherwise would have required a reversal of the trial court's ruling *(Megee v. Barnes,* 160 N.W. 2d 815 (Iowa 1965)), affirmed. Noting that, one by one, states have defected from "the banner" to join jurisdictions aligning themselves on the side of governmental responsibility rather than governmental immunity, the Court said: "Today's decision forsakes that rationale and adopts the rule espoused by many jurisdictions and most graphically described by the Supreme Court of Washington when abrogating its charitable immunity rule in 1953, 'We closed our courtroom doors without legislative help, we can likewise open them.'" *Id.* at 119.

After examining the obligations which the Iowa Code imposed upon the defendant the Court concluded that "to a certainty the department cannot function without countless day-to-day contractual dealings. Of course, the State expects the other contracting parties to honor these obligations. It can—and does—seek redress when they fail to do so.

"Just as certainly *they* expect faithful performance by the State; but they have been left without adequate recourse when these expectations are unfulfilled. We do not consider a request for legislative allowance to be a satisfactory remedy for breach of a contractual duty. We agree with those courts which say the State, by entering into a contract, agrees to be answerable for its breach and waives its immunity from suit to that extent. To hold otherwise, these courts say, is to ascribe bad faith and shoddy dealing to the sovereign. They are unwilling to do so; and we are too." *Id.* at 119-20.

The argument that the defense of sovereign immunity should be retained in suits against the State on its contracts because a judgment against the State would be uncollectible unless the legislature accepted it and provided for its payment was considered and rejected by the Supreme Court of New Jersey in *P, T & L Constr. Co. v. Commissioner, Dept. of Transp.*, 55 N.J. 341, 262 A. 2d 195 (1970) and by the Supreme Court of Missouri in *Dicarlo Constr. Co. v. State*, 485 S.W. 2d 52 (1972).

In *P, T & L Constr. Co. v. Commissioner, Dept. of Transp.*, *supra*, a suit against the State on a written contract for public construction, Weintraub, C. J., speaking for a unanimous court, said: "Whether appropriated moneys are still on hand, we do not know, but we think it is time to settle the larger question whether the courts should be open to a person who holds a contract with the State even though satisfaction of a favorable judgment would depend wholly upon the willingness of the Legislature to accept the judgment and provide for payment.

"If our coordinate branches made it plain that they would be indifferent to our judgments in such matters, we would indeed be loath to be party to the spectacle such a conflict of wills would create. But there is no reason to suppose that our efforts will be ignored. The immunity concept is judge-made. Its roots are hard to find, as others have carefully noted. . . . Obviously there should be an established form in which all such claims may be presented as of right and upon known principles. The judiciary of course is able to meet that need. This is not to say that another tribunal would be unsuitable. The point is that a court of claims has not been created, and until one is established, if it should be, the judiciary ought not to withhold its hand on a mere assumption that its coordinate branches would want it that way.

"We add that other jurisdictions have held, on one theme or another, that a State may be sued in its own courts on contracts it authorized." *Id.* at 55 N.J. 346, 262 A. 2d at 198.

In *Dicarlo Construction Co. v. State, supra,* after deciding "that when the State enters into a validly authorized contract, it lays aside whatever privilege of sovereign immunity it otherwise possesses and binds itself to performance, just as any private citizen would do by so contracting," the Court considered the State's assertion that "any judgment will be unenforceable and suit should not be maintainable for that reason." Citing and quoting with approval from *P, T & L Construction Co. v. Commissioner, Department of Transportation, supra,* the Missouri Court said:

"Courts usually do not examine the pocketbook of the defendant to determine whether a suit may be maintained. If a cause of action is stated and all necessary prerequisites to maintenance of such suit exist, the case is heard. Only if and when a judgment is rendered is attention given as to whether the judgment is collectible. The same should be true here. If, as we find, the State impliedly has consented to waive its sovereign immunity and to be sued on this contract, the plaintiff should be entitled to proceed with his suit and secure an adjudication thereof. The matter of collectibility will come later.

"We have no reason to believe that the General Assembly would not recognize as an obligation of the State any judgment finally rendered as a result of such litigation. On the contrary, we have every reason to believe that it would recognize and appropriate for such obligation. This procedure does not violate the separation of powers provided for in the Constitution. It is appropriate for the judicial branch to adjudicate whether the State is obligated as a result of a contract dispute. It remains for the General Assembly to appropriate the money if it be determined that the State is so obligated.

"This is a period when much is being said by members of the public as to the need for government to be responsive and responsible. The very antithesis of responsibility by government would be to say that it may contract with a citizen and assume obligations under the contract and then be permitted to disavow and say to the citizen that the State has breached the contract but you can't do anything about it because the government has not expressly consented to the maintenance of the suit. We have

Smith v. State

every confidence that the General Assembly did not so intend."
*Id.* at 57-58.

From the foregoing cases we see that the courts which have
held a state implicitly consents to be sued upon any valid con-
tract into which it enters were moved by the following con-
siderations: (1) To deny the party who has performed his
obligation under a contract the right to sue the state when it
defaults is to take his property without compensation and
thus to deny him due process; (2) To hold that the state may
arbitrarily avoid its obligation under a contract after having
induced the other party to change his position or to expend
time and money in the performance of his obligations, or in
preparing to perform them, would be judicial sanction of the
highest type of governmental tyranny; (3) To attribute to the
General Assembly the intent to retain to the state the right,
should expedience seem to make it desirable, to breach its obli-
gation at the expense of its citizens imputes to that body "bad
faith and shoddiness" foreign to a democratic government; (4)
A citizen's petition to the legislature for relief from the state's
breach of contract is an unsatisfactory and frequently a totally
inadequate remedy for an injured party; and (5) The courts
are a proper forum in which claims against the state may be
presented and decided upon known principles.

[2] We too are moved by the foregoing considerations. We hold,
therefore, that whenever the State of North Carolina, through
its authorized officers and agencies, enters into a valid contract,
the State implicitly consents to be sued for damages on the
contract in the event it breaches the contract. Thus, in this case,
and in causes of action on contract arising after the filing date
of this opinion, 2 March 1976, the doctrine of sovereign im-
munity will not be a defense to the State. The State will occupy
the same position as any other litigant. *See Lyon & Sons v.
Board of Education, supra.* Any other decision by this Court
could only serve as a warning to one who changes his position
to accept employment with the State that, if the State breaches
his contract and discharges him without cause he will have no
recourse to the courts to establish his claim for damages. We
would not thus discredit our State whose reputation for in-
tegrity and fiscal responsibility is evidenced by the AAA rating
of its bonds and the fact that it has not defaulted upon an
obligation since its readmission into the Union in 1868.

**[3]** From the foregoing it follows that the trial court's denial of the State's motion to dismiss this action is affirmed. Plaintiff's suit is predicated upon a contract which was fully authorized by the State legislature. He may, therefore, prosecute his claim against the State.

In the event plaintiff is successful in establishing his claim against the State, he cannot, of course, obtain execution to enforce the judgment. *P, T & L Const. Co. v. Commissioner, Dept. of Transp., supra. See also Fitzgerald v. Palmer,* 47 N.J. 106, 219 A. 2d 512 (1966) ; 72 Am. Jur. 2d *States, Etc.* § 127 (1974). The validity of his claim, however, will have been judicially ascertained. The judiciary will have performed its function to the limit of its constitutional powers. Satisfaction will depend upon the manner in which the General Assembly discharges its constitutional duties.

We do not apprehend that this decision will result in any unseemly conflict between the legislative and judicial branches of the government. Nor do we anticipate that it will have a significant impact upon the State treasury or substantially affect official conduct. Past performance convinces us that when the State has entered into a contract, the officials who made it intended that the State would keep its part of the bargain. It has been the policy of this State to meet its valid obligations, and we foresee no change in that policy. The purpose of this decision is to implement the policy and to provide a remedy in exceptional situations where one may be required.

The legislature has already consented to be sued in many important contractual situations. For example, G.S. § 143-135.3 (Supp. 1975) authorizes civil actions on claims arising out of completed contracts for construction or repair work awarded by any state board. In addition, G.S. § 136-29(b) (1974) allows a road construction contractor to sue if his contract claim is denied by the State Highway Administrator and G.S. § 115-142(n) (1975) allows a teacher whose employment has been terminated to appeal to the superior court. Similarly G.S. § 153A-11 (1974) and G.S. § 160-11 (Supp. 1975) provide that counties and cities may contract and be contracted with and that they may sue and be sued. The General Assembly having consented to contract suits in these areas, we can perceive no sound reason why the doctrine of sovereign immunity should be a defense to any action for the breach of a duly authorized State contract.

At this point we wish to emphasize two important facts:

(1) We are not now concerned with the merits of the controversy between Dr. Smith and the State or its officials. We have no knowledge, opinion, or notion as to what the true facts are. These must be established at the trial. Today we decide only that plaintiff is not to be denied his day in court because his contract was with the State.

(2) This decision has no application to the doctrine of sovereign immunity as it relates to the State's liability for torts. That question is not involved in this case. While we continue to be aware of the many valid criticisms of governmental immunity from tort liability, which we noted in *Steelman v. City of New Bern, supra,* it may well be that if the State's immunity from tort liability is to be abolished or modified it should be done under rules, and perhaps within limits, fixed by the General Assembly. *See* Comment, *The Role of the Courts in Abolishing Governmental Immunity,* 1964 Duke L.J. 888. As to waiver of immunity, distinctions can be made between tort and contract liability.

The State is liable only upon contracts authorized by law. When it enters into a contract it does so voluntarily and authorizes its liability. Furthermore, the State may, with a fair degree of accuracy, estimate the extent of its liability for a breach of contract. On the other hand, the State never authorizes a tort, and the extent of tort liability for wrongful death and personal injuries is never predictable. With no limits on liability jury verdicts could conceivably impose an unanticipated strain upon the State's budget. Indeed, potential liability under the present open-end wrongful death statute alone (G.S. 28A-18-2 (Supp. 1975)) could create serious problems. For the extent to which the State has waived its immunity from tort claims, see G.S. 143-291 to G.S. 143-300.1 (1974).

Incidentally, we note that at least two states, Iowa and Delaware, which have abrogated sovereign immunity in actions for breach of its contracts have subsequently retained immunity from tort liability. *See Charles Gabus Ford v. Iowa State Highway Comm.,* 224 N.W. 2d 639 (Iowa 1974) and *Blair v. Anderson,* 325 A. 2d 94 (Del. 1974).

At this juncture we are constrained to point out that nothing in our present Constitution precludes the result we have reached.

Smith v. State

The North Carolina Constitution of 1868, Article IV, Section 11 provided: "The Supreme Court shall have original jurisdiction to hear claims against the State, but its decisions shall be merely recommendatory: no process in the nature of execution shall issue thereon; they shall be reported to the next session of the General Assembly for its action."

Section 10 of Article IV provided: "The Supreme Court shall have jurisdiction to review upon appeal, any decision of the courts below, upon any matter of law or legal inference; but no issue of fact shall be tried before this court; and the court shall have power to issue any remedial writs necessary to give it a general supervision and control of the inferior courts.

The Constitutional Convention of 1875 renumbered section 11 above as section 9. Section 10 became section 8 after being amended to read as follows:

"The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the courts below, upon any matter of law or legal inference. And the jurisdiction of said court over 'issues of fact' and 'questions of fact' shall be the same exercised by it before the adoption of the Constitution of one thousand eight hundred and sixty eight, and the court shall have the power to issue any remedial writs necessary to give it general supervision and control over the proceedings of the inferior courts."

Thereafter sections 8 and 9 remained separate and unchanged until the general election on 6 November 1962 when the electorate ratified the rewrite of Article IV ("Judicial Department") of the constitution, submitted under N. C. Sess. Laws, ch. 313 (1961). In this revision sections 8 and 9 were combined as section 10(1) in words as follows:

"Sec. 10. Jurisdiction of the General Court of Justice.

"(1) Supreme Court. The Supreme Court shall have jurisdiction to review upon appeal any decision of the courts below, upon any matter of law or legal inference. The jurisdiction of the Supreme Court over 'issues of fact' and 'questions of fact' shall be the same exercised by it prior to the adoption of this Article, and the Court shall have the power to issue any remedial writs necessary to give it a general supervision and control over the proceedings of the other courts. The Supreme Court shall have original jurisdiction to hear claims against the State, but

its decisions shall be merely recommendatory; no process in the nature of execution shall issue thereon; the decisions shall be reported to the next Session of the General Assembly for its action."

Obviously the first two sentences of Section 10(1) are former Section 8, wording slightly different but meaning unchanged; and the last sentence is former Section 9 unchanged.

In 1969, the General Assembly again proposed amendments to Article IV. *See* N. C. Sess. Laws, ch. 1258 (1969). These amendments, approved at the general election of 3 November 1970, became effective on 1 July 1971. In consequence, the jurisdiction of the Supreme Court is presently as stated in N. C. Const. art. IV, § 12 as follows:

"Sec. 12, *Jurisdiction of the General Court of Justice.*

"(1) *Supreme Court.* The Supreme Court shall have jurisdiction to review upon appeal any decision of the courts below, upon any matter of law or legal inference. The jurisdiction of the Supreme Court over 'issues of fact' and 'question of fact' shall be the same exercised by it prior to the adoption of this Article, and the Court may issue any remedial writs necessary to give it general supervision and control over the proceedings of other courts."

As now written, Article IV, § 12(1) is identical with former § 10(1) (1962) *except that* the last sentence of § 10(1) is omitted. The omitted sentence was Section 11 of the Constitution of 1868, the provision which gave the Supreme Court original jurisdiction over claims against the State. This provision is no longer in the Constitution.

The provision of Section 12(1) which retains the jurisdiction of the Supreme Court over "issues of fact" and "questions of fact" as it had existed prior to the 1971 revision, that is, since 1875 at least, has no relation to the Court's prior original jurisdiction over claims against the State. As pointed out by Justice Connor in *Lacy v. State,* 195 N.C. 284, 141 S.E. 886 (1928), "This jurisdiction with respect to 'issues' or 'questions of fact' is exercised only in actions which are equitable in their nature, and in which relief is sought upon equitable principles." *Id.* at 286, 141 S.E. at 888. *See Realty Corp. v. Kalman,* 272 N.C. 201, 159 S.E. 2d 193 (1967); *Deal v. Sanitary District,* 245 N.C. 74, 95 S.E. 2d 362 (1956); *Worthy v. Shields,* 90 N.C. 192 (1884).

In construing the limits of its original jurisdiction over claims against the State prior to 3 November 1970, this Court repeatedly and expressly held that such jurisdiction did not include claims involving issues of fact. In *Lacy v. State, supra,* it is said: "This Court has held in all the proceedings instituted since the adoption of the Constitution of 1868, in which the orginal jurisdiction with respect to claims against the State has been invoked, that such jurisdiction extended only to the decision of issues of law involved in such claims. It has declined to consider or to determine issues of fact, or to make decisions upon claims which involved only such issues." *Id.* at 288, 141 S.E. at 889.

[4] From the foregoing discussion it is quite clear that our Constitution no longer gives the Supreme Court original jurisdiction over claims against the State. Since 1 July 1971 its jurisdiction over such claims has been the same as its jurisdiction over all other claims, that is, "to review upon appeal any decision of the courts below, upon any matter of law or legal inference." N. C. Const. art. IV, § 12(1) (1971). Under the present Constitution the Superior Court has original general jurisdiction throughout the State except as otherwise provided by the General Assembly. N. C. Const. art. IV, § 12(3) (1971).

Although defendants do not rely upon G.S. 7A-25, and it was not cited by either party or the Court of Appeals, we deem it necessary to adjudicate the effect of the 1971 revision of N. C. Const., art. IV upon G.S. 7A-25. This statute was enacted as N. C. Sess. Laws, ch. 108, § 1 (1967). As codified it now appears in Vol. 1B, N. C. Gen. Stats., ch. 7A, Art. 5 "Jurisdiction" (1969), and reads as follows:

"§ 7A-25. *Original jurisdiction of the Supreme Court.*— The Supreme Court has original jurisdiction to hear claims against the State, but its decisions shall be merely recommendatory; no process in the nature of execution shall issue thereon; the decisions shall be reported to the next session of the General Assembly for its action. The court shall by rule prescribe the procedures to be followed in the proper exercise of the jurisdiction conferred by this section."

At this point a review of the legislative history of G.S. 7A-25 seems appropriate. Except for the last sentence its wording is identical with that of N. C. Const. art. IV, § 11 (1868) and with a statute enacted by the General Assembly of 1868

as section 415 of the Code of Civil Procedure. At the same time the General Assembly also enacted, as section 416 of the Code of Civil Procedure, the following statute:

"Any person having any claim against the state may file his complaint in the office of the clerk of the supreme court, setting forth the nature and grounds of his claim. He shall cause a copy of his complaint to be served on the governor, and therein request him to appear on behalf of the state and answer his claim. The copy shall be served at least twenty days before application for relief shall be made to the court. In case of an appearance for the state by the governor, or any other authorized officer, the pleadings and trial shall be conducted in such manner as the court shall direct. If an issue of fact shall be joined on the pleadings, the court shall transfer it to the superior court of some convenient county for trial by a jury, as other issues of fact are directed to be tried, and the judge of the court before whom the trial is had shall certify to the supreme court, at its next term, the verdict and the case, if any, made up and settled as prescribed in cases of appeal to the supreme court. If the state shall not appear in the action by any authorized officer, the court may make up issues and send them for trial, as aforesaid. The supreme court shall in all cases report the facts found, and their recommendation thereon, with the reasons thereof, to the general assembly at its next term."

Between 1868 and 1967 the foregoing two statutes, unchanged, appeared respectively as sections 415 and 416 of the Code of Civil Procedure in Battle's Revisal (1873); as "Sec. 947. Claims against the State," and "Sec. 948. Manner of Prosecuting Claims against the State," in the Code of North Carolina (1883); as §§ 1537 and 1538 of the Revisals of 1905 and 1908; as sections 1409 and 1410 in the Consolidated Statutes (1919) and in the N. C. Code of 1935 and 1939; and as § 7-8 and § 7-9 of the General Statutes of North Carolina (1943).

Perhaps the most significant case involving these statutes is *Lacy v. State, supra.* That case involved a claim in contract against the State Highway Commission, filed in this Court under C.S. 1409 and C.S. 1410. In dismissing "the proceeding," the Court noted, *inter alia,* that the State was "not subject to an action on the contract"; that the only issue presented was one of fact and the Court determines no such issues. Justice Connor, writing the opinion of the Court, used the occasion to point out that, in purporting to prescribe the procedure by which the

Supreme Court would exercise its original jurisdiction to hear and decide claims against the State, the General Assembly had exceeded its constitutional authority. Justice Connor wrote:

"It is well settled that the General Assembly is without power to prescribe or to regulate the rules of practice or procedure in the Supreme Court, in accordance with which it shall exercise its appellate jurisdiction. The Court prescribes its own rules; these cannot be modified or regulated by statute. The same principle is applicable to the rules of practice and procedure in accordance with which the Court shall exercise its original jurisdiction with respect to claims against the State." *Id.* at 287-88, 141 S.E. at 889.

With specific reference to C.S. 1410 the Court continued: "Insofar as this statute provides for and prescribes the procedure by which a claimant may invoke the original jurisdiction of this Court, conferred by the Constitution, with respect to his claim against the State, it is valid, and enforceable in all respects; when, however, a proceeding has been duly instituted and filed in this Court, in accordance with the provisions of the statute, the procedure by which the Court will thereafter exercise its power to hear and decide upon the claim is not controlled by the statute. . . . When, however, in order to decide an issue or question of law involved, the Court deems it best to have issues of fact first determined, the Court may or may not follow the provisions of the statute with respect to a trial by jury of such issues. The statute is at most, in this respect, directory. It cannot be controlling." *Id.* at 288-90, 141 S.E. at 890.

In spite of the pronouncements in *Lacy v. State,* G.S. 7-9, which was a subsequent recodification of C.S. § 1410, remained in the books until both it and G.S. 7-8 were repealed by N. C. Sess. Laws, ch. 108, § 12 (1967), an enactment which rewrote Chapter 7A ("General Court of Justice"), Subchapter II ("Appellate Division of the General Court of Justice"), of the General Statutes and, *inter alia,* created the Court of Appeals. The repeal of G.S. 7-9 conformed the statutory law to the Lacy decision. However, since the Constitution in 1967 still gave the Supreme Court original jurisdiction over claims against the State, the General Assembly deemed it appropriate to reenact a statute in the words of the constitutional provision then in effect (last sentence of Sec. 10(1), art. IV) for inclusion in Chapter 7A of the General Statutes. The result was G.S. 7A-25 (1969).

The continued presence of G.S. 7A-25 in Chapter 7A of the General Statutes after the 1971 revision of N. C. Const. art. IV, which took away this Court's original jurisdiction to entertain claims against the State, prima facie created an anomaly. In our view, however, none was intended, and it is eliminated by N. C. Sess. Laws, ch. 1258 (1969), which proposed the revision of Article IV. Section 5 of that Act provided: "All laws and clauses of laws in conflict with this Act are repealed."

We hold that upon the ratification of the proposed revision of Article IV on 3 November 1970, G.S. 7A-25 was repealed. The jurisdiction which G.S. 7A-25 purported to give to this Court exceeded that granted to it in revised Article IV. The statute, therefore, is in conflict with N. C. Sess. Laws, ch. 1258 (1969) and repealed by Section 5 of that enactment. This was also the view of the North Carolina State Constitution Commission, which drafted the proposed revision of Article IV submitted to the electorate under authority of Chapter 1258 of N. C. Sess. Laws (1969). In its report of 16 December 1968 to the North Carolina State Bar and the North Carolina Bar Association in which it compared proposed Section 12(1) with its then existing counterpart, Section 10(1), the Commission stated: "The old language giving the Supreme Court long-unused jurisdiction to hear claims against the State is omitted from proposed Section 12(1). This type of claim is heard by the Industrial Commission under a statutory procedure."

Thus, we have no doubt both the Commission and the General Assembly intended that N. C. Sess. Laws, ch. 1258, § 5 (1969) should repeal G.S. 7A-25. However, we also conclude that, had it not been repealed, G.S. 7A-25 would be unconstitutional.

It is a well-established principle of constitutional law that when the jurisdiction of a particular court is constitutionally defined, the legislature cannot by statute restrict or enlarge that jurisdiction unless authorized to do so by the constitution. This principle is grounded on the separation of powers provisions found in many American constitutions, including N. C. Const. art. I, § 6 and art. IV, § 1 (1971). *See Marbury v. Madison*, 1 U.S. (Cranch) 137, 174-80, 2 L.Ed. 60, 72-74 (1803); *American Party of Arkansas v. Brandon*, 253 Ark. 123, 484 S.W. 2d 881 (1972) *(per curiam); Nethercutt v. Pulaski County Special School District*, 248 Ark. 143, 450 S.W. 2d 777 (1970); *People v. Carter*, _____ Colo. _____, 527 P. 2d 875 (1974); *State ex*

*rel. Buckwalter v. City of Lakeland,* 112 Fla. 200, 150 So. 508 (1933); *Albert v. Parish of Rapides,* 256 La. 566, 237 So. 2d 380 (1970); *Board of Supervisors of Elections v. Attorney General,* 246 Md. 417, 229 A. 2d 388 (1967); *Sevinskey v. Wagus,* 76 Md. 335, 25 A. 468 (1892); *Ward v. Public Service Comm.,* 341 Mo. 227, 108 S.W. 2d 136 (1937); *O'Neill v. Vreeland,* 6 N.J. 158, 77 A. 2d 899 (1951); *Classic Pictures, Inc. v. Department of Ed.,* 158 Ohio St. 229, 108 N.E. 2d 319 (1952) *(per curiam); Thompson v. Redington,* 92 Ohio St. 101, 110 N.E. 652 (1915); *Bandy v. Mickelson,* 73 S.D. 485, 44 N.W. 2d 341 (1950); *Lane v. Ross,* 151 Tex. 268, 249 S.W. 2d 591 (1952); *Darnell v. Noel,* 34 Wash. 2d 428, 208 P. 2d 1194 (1949). *See also,* 16 Am. Jur. 2d *Constitutional Law* § 239 (1964) and cases cited in fn. 7; 21 C.J.S. *Courts* § 121 (1940) and cases cited; Second Decennial Digest Constitutional Law § 56 and cases cited; Fourth Decennial Digest Constitutional Law § 56 and cases cited.

This Court applied the foregoing principle in *Utilities Comm. v. Finishing Plant,* 264 N.C. 416, 142 S.E. 2d 8 (1965). In that case we considered the constitutionality of a state statute which purported to allow a party to bypass the superior court and to appeal directly to this Court from the decision of the Utilities Commission. In writing the opinion of the Court, Justice Bobbitt (later Chief Justice), said: "The jurisdiction of the Supreme Court is conferred and defined by the Constitution, not by the General Assembly. Under Section 10 of Article IV, the jurisdiction of the Supreme Court is to review on appeal decisions 'of the courts below.' This does not include jurisdiction to review on direct appeal the decisions of administrative agencies.

. . . . .

"The conclusion reached is that, under the present provisions of Article IV, the appellate jurisdiction of the Supreme Court relates solely to appeals from decisions of 'the courts below,' and that the General Assembly has no authority to provide for appeal from decisions of administrative agencies to the Supreme Court without prior appeal to and review by a lower court within the General Court of Justice. Hence, G.S. 62-99 is held unconstitutional and void." *Id.* at 422, 142 S.E. 2d 12-13.

Thus *Finishing Plant, supra,* squarely held the General Assembly without authority to expand the appellate jurisdiction

of this Court beyond the limits set in the Constitution. *See also Rencher v. Anderson,* 93 N.C. 105, 107 (1885).

In summary, our conclusions are these: (1) Under the Constitution as revised in 1971, the Supreme Court is strictly an appellate court, its jurisdiction limited "to review upon appeal any decision of the courts below upon any matter of law or legal inference." N. C. Const. art. IV, § 12(1). (2) This Court now has no original jurisdiction over claims against the State, and the General Assembly has no authority to confer such jurisdiction upon it. N. C. Const. art. I, § 6. (3) G.S. 7A-25 (1969) was rendered null and void on 3 November 1970 when the electorate approved revised Article IV, submitted under N. C. Sess. Laws, ch. 1258 (1969), which deleted the provision granting the Supreme Court original jurisdiction of claims against the State. (4) The appropriate trial court of the General Court of Justice now has original jurisdiction to adjudicate claims against the State.

We now consider appellants' motion to dismiss the action against them as individuals. Again we note that their motion was based solely on the premise that the State is the real party in interest and protected by its sovereign immunity; that the individual defendants, in their dealings with plaintiff, were merely performing their official duties and were, therefore, protected by the State's sovereign immunity. The Court of Appeals paid scant attention to this aspect of the case and interpreted plaintiff's complaint as alleging only a claim for "monetary damages resulting from the State's alleged breach of contract." (By "monetary damages" we understand that court to have meant lost salary.) Having decided that by entering into "a statutorily authorized contract of employment for a specific number of years with plaintiff, the State had waived its immunity from suit for a breach thereof," the Court of Appeals merely affirmed the trial judge's denial of defendants' motion to dismiss. It did not discuss the allegations contained in paragraph 3 of our summary of the complaint in the preliminary statement of facts as bearing upon the question of defendants' individual liability.

In his briefs, filed in both the Court of Appeals and in this Court, plaintiff has contended that the allegations of paragraph 3 state a claim sounding in tort against the individual defendants in addition to his claim against the State for salary lost in consequence of the State's breach of its contract. Whether the Court of Appeals overlooked these allegations or deemed

them insufficient under G.S. 1A-1, Rule 8(a) or Rule 9(i) to state a claim for which relief can be granted in addition to damages for breach of contract to pay salary, we cannot say, of course. It is apparent, however, that the primary interest of both the trial judge and the Court of Appeals was in establishing a principle of law and not in requiring the plaintiff to provide the court with a plain statement of his claim.

In their rulings on the individual defendants' motion to dismiss, both courts have, in effect, held that plaintiff's allegations are sufficient to give defendants adequate notice of the transactions and occurrences he intends to prove.

In this regard, decisions of this Court assert generally that the official status of State officers, standing alone, does not immunize them from suit. *See Lewis v. White,* 287 N.C. 625, 643, 216 S.E. 2d 134, 146 (1975) ; *Pharr v. Garibaldi,* 252 N.C. 803, 115 S.E. 2d 18 (1960) ; *Schloss v. Highway Commission,* 230 N.C. 489, 492, 53 S.E. 2d 517, 519 (1949) ; *Pue v. Hood,* 222 N.C. 310, 315, 22 S.E. 2d 896, 900 (1942).

However, as this Court said in *Smith v. Hefner,* 235 N.C. 1, 7, 68 S.E. 2d 783, 787 (1952), "It is settled law in this jurisdiction that a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto. The rule in such cases is that an official may not be held liable *unless it be alleged and proved* that his act, or failure to act, was corrupt or malicious (cites omitted), or that he acted outside of and beyond the scope of his duties." (Emphasis added.) As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability. *Carpenter v. Atlanta & C.A.L. Ry.,* 184 N.C. 400, 406, 114 S.E. 693, 696 (1922). As to the personal liability of a governor, see 28 Am. Jur. 2d *Governor* § 11 (1968).

[5] Applying the foregoing statements to the present case, we are constrained to agree with the lower courts' denial of the individual defendants' motion to dismiss. The allegations of the complaint are in the broad and general terms permitted by G.S. 1A-1, Rule 8(a), and we cannot say that it appears beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief against the individual

defendants. *Sutton v. Duke,* 277 N.C. 94, 176 S.E. 2d 161 (1970). We emphasize, however, that such vague and conclusory pleading is not encouraged or commended by this Court. *Id.* at 105, 176 S.E. 2d at 167.

Obviously in the present posture of the case and in view of the general and inferential allegations of the complaint it would be unwise for this Court to attempt to provide and explore conceptual legal theories of liability or defense. This appeal was premature since ordinarily no appeal lies from a denial of a motion to dismiss. *North Carolina Consumers Power, Inc. v. Duke Power Co.,* 285 N.C. 434, 437, 206 S.E. 2d 178, 181 (1974) ; *Acorn v. Knitting Corp.,* 12 N.C. App. 266, 182 S.E. 2d 862 (1971).

However, we do deem it advisable to point out that the individual defendants are not parties to the employment contract upon which plaintiff bases his suit against the State anymore than the president of a corporation is a party to the contract he executes in his official capacity for the corporation. *See* 63 Am. Jur. 2d *Public Officers and Employees* §§ 319, 320 (1972) ; 19 Am. Jur. 2d *Corporations* §§ 1345, 1346 (1965). In the absence of circumstances which do not appear here, when a contract is made with a known agent, acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone. *Jenkins v. City of Henderson,* 214 N.C. 244, 247, 199 S.E. 37, 39 (1938) ; 3 Am. Jur. 2d *Agency* § 294 (1962).

[6]  Thus, when an action for breach of contract to recover lost benefits is brought against the State and the officials who acted for the State in the transaction which is the basis for the suit, the State alone will be liable for a breach of the contract. In such a case, to hold the officials liable, a plaintiff must state and prove more than a claim for breach of contract. *See* statements in *Pue v. Hood, supra,* and *Smith v. Hefner, supra.* In the present case what more does plaintiff intend to prove and under what law does he proceed? As of now we can only speculate.

If plaintiff, in view of our holding that he may sue the State for breach of contract, wishes to pursue his action against the individual defendants it would be helpful to all concerned if he would request and receive permission to amend his complaint to make a more definite statement of his claim. In any

Smith v. State

event, the facilities of pretrial discovery and motion for summary judgment are still available to the individual defendants to test the merits of plaintiff's case as a matter of law.

Presumably the Court of Appeals allowed defendants' petition for certiorari only because, in refusing to dismiss this action against the State on the ground of its sovereign immunity, Judge Ervin had declined to follow the previous decisions of this Court. As the Supreme Court of Iowa said in a similar factual situation, "If trial courts venture into the business of predicting when this court will reverse its previous holdings . . . they are engaged in a high-risk adventure which we strongly recommend against. However, when their judgment proves prophetic, we should not refuse to affirm simply to demonstrate our final authority." *Kersten Co. v. Department of Social Services*, 207 N.W. 2d 117, 121 (Iowa, 1973).

[7] Defendants' final assignment of error is that the trial judge erred in denying their motion to change the venue of this action from Burke County to Wake. As to the individual defendants, G.S. 1-77(2) (1969) provides that actions against a public officer, or person especially appointed to execute his duties, for an act done by virtue of his office must be tried in the county where the cause, or some part thereof, arose. In *Coats v. Sampson County Memorial Hospital, Inc.*, 264 N.C. 332, 141 S.E. 2d 490 (1965), it is said: "Any consideration of G.S. 1-77(2) involves two questions: (1) Is defendant a 'public officer or person especially appointed to execute his duties'? (2) In what county did the cause of action in suit arise?" *Id.* at 333, 141 S.E. 2d at 491.

Appellants correctly concede that they are public officers. Each "is charged with duties involving the exercise of some portion of the sovereign power." *See* 6 Strong's N. C. Index 2d *Public Officers* § 1 (1968). However, we do not agree with their contention that any potential cause of action against them necessarily arose in Wake County. As stated in *Coates v. Hospital, supra,* the broad general rule is that " 'the cause of action arises in the county where the acts or omissions constituting the basis of the action occurred.' " *Id.* at 334, 141 S.E. 2d at 492. "[A] cause of action may be said to accrue, within the meaning of a statute fixing venue of actions, when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested." 77 Am. Jur. 2d *Venue* § 37 (1975).

In this case, the controversy concerning the tapes arose in Burke County, and it was there that plaintiff was allegedly discharged summarily, without cause, and without an opportunity to be heard. Plaintiff's right to sue accrued when he was dismissed. Since the dismissal came in Burke County, any potential cause of action arose there. As pointed out by Judge Parker in his opinion for the Court of Appeals, "The mere fact that plaintiff's discharge was thereafter affirmed by various State officials based in Raleigh does not entitle appellants, as a matter of right, to a change of venue to Wake County under the statute." *Smith v. State*, 23 N.C. App. 423, 428, 209 S.E. 2d 336, 339 (1974). The trial judge properly denied appellant's motion for a change of venue.

G.S. 1-77, however, does not apply to actions against the State. As to suits on contracts generally there is no venue statute specifically applicable to the State. This case, therefore, is governed by G.S. 1-82 (1969), which provides in pertinent part: "In all other cases the action must be tried in the county in which the plaintiffs or the defendants, or any of them, reside at its commencement. . . ." Thus, plaintiff, as a resident of Burke County, was entitled to institute this action there. We recognize that there may be reasons why any action against the State should be brought in Wake County, where its capital is located. If so, the General Assembly will undoubtedly so provide.

Finally, we reemphasize that nothing said in this opinion is to be construed as a commentary on the merits of the case, an evaluation of which is obviously impossible at this state of the proceedings. We hold only that plaintiff is entitled to have his claim against the State, as well as his claim against the individual defendants, adjudicated.

The decision of the Court of Appeals is affirmed.

Affirmed.

Justice LAKE dissenting.

The question before us on this appeal is not whether Dr. Smith was wrongfully discharged. He says he was. The Executive Department of the State Government says he was not. The only question now before us is, Do the courts of this State have jurisdiction to review the discharge of a State employee by the

Executive Department to determine whether it was a breach of contract and, if it was, to order the Executive Department to pay him damages out of the State treasury? It is my view that the courts of North Carolina, including this Court, have not been given that authority and so I dissent.

My dissent is based upon four sections of the Constitution of North Carolina, brought forward from our first Constitution through each intervening revision and reaffirmed by the people of the State when they adopted our present Constitution as recently as 1970.

These are:

Article I, Sec. 2: *"Sovereignty of the people.* All political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole."

Article I, Sec. 6: *"Separation of powers.* The legislative, executive and supreme judicial powers of the State government shall be forever separate and distinct from each other."

Article I, Sec. 12: *"Right of assembly and petition.* The people have a right * * * to apply to the General Assembly for redress of grievances; * * * "

Article I, Sec. 35: *"Recurrence to fundamental principles.* A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty."

In *State v. Holden,* 64 N.C. 829 (1870), our predecessors on this Court, refusing to issue process against the Governor, said, "Each of these co-ordinate departments has it appropriate functions, and one cannot control the action of the other, in the sphere of its constitutional power and duty."

In *Person v. Watts,* 184 N.C. 499, 115 S.E. 336 (1922), Justice Adams, speaking for the Court, said concerning the constitutional requirement of separation of powers: "As to the wisdom of this provision there is practically no divergence of opinion—it is the rock upon which rests the fabric of our government. * * * The courts have absolutely no authority to control or supervise the power vested by the Constitution in the General Assembly as a coordinate branch of the government."

Quite obviously, the courts are equally without power to supervise the actions of the Executive Department within its constitutional sphere.

In *Wilson v. Jenkins*, 72 N.C. 5 (1875), Chief Justice Pearson, affirming the refusal of the lower court to issue a writ of mandamus directing the State Treasurer to pay interest coupons upon bonds issued in the name of the State—an alleged breach of a State contract—said: "[T]he courts have no power to compel, by *Mandamus*, the Public Treasurer to pay a debt which the General Assembly has directed him not to pay * * *." As Justice Adams also said in *Person v. Watts, supra:* "Judicial tribunals are not moot courts. It is their duty not to express opinions which can have no practical effect, but to decide questions of merit, to render judgment that may be enforced, to do practical work, and to put an end to litigation."

If, in the present case, a judgment be rendered that the Executive Department has wrongfully discharged Dr. Smith, its employee, in violation of his contract, and, therefore, the State must pay him a specified sum as damages, how will that judgment be enforced? Will execution be levied upon funds or lands of the State?

The majority opinion declares: "Thus, in this case, and in causes of action on contract arising after the filing date of this opinion, 2 March 1976, the doctrine of sovereign immunity will not be a defense to the State. *The State will occupy the same position as any other litigant.*" (Emphasis mine.) Two paragraphs later, the majority opinion declares: *"In the event plaintiff is successful in* establishing his claim against the State, *he cannot, of course, obtain execution to enforce the judgment."* (Emphasis mine.) The majority evidently sees no inconsistency in the two statements.

But the question remains unanswered—How will the judgment be enforced? The majority opinion evades that question by declaring: "We do not apprehend * * * any unseemly conflict between the legislative and judicial branches of the government." What about an "unseemly conflict" between the Judicial Department and the Executive Department—the branch which is, here and now, denying our authority to adjudicate Dr. Smith's claim and order it to pay him damages? Would a conflict be "unseemly" if the other two branches of the State Government decline to concur in our view that the Judicial De-

partment has superior wisdom or higher ethical standards than the Executive Department in determining whether to discharge an employee of that department?

The majority opinion, after declaring that Dr. Smith cannot "obtain execution to enforce the judgment," says: "The validity of his claim, however, will have been *judicially* ascertained. *The judiciary will have performed its function* to the limit of its constitutional powers. Satisfaction will depend upon the manner in which the General Assembly discharges its *constitutional duties.*" (Emphasis mine.) This, in my opinion, simply begs the question and blandly ignores the principles repeatedly stated in decisions of our predecessors on this Court. It is not the function of the judiciary of this State to ascertain the merits of Dr. Smith's claim and the General Assembly has no constitutional duty to obey our unconstitutional order that damages be paid to him.

In *Lacy v. State,* 195 N.C. 284, 141 S.E. 886 (1928), a unanimous Court, speaking through Justice George Connor, said: "The claim upon which this proceeding was instituted arises out of a contract between the claimant and the State Highway Commission. The latter is an agency of the State, which is the real party to the contract, *and therefore is not subject to an action on the contract.*" (Emphasis mine.)

As Justice Adams said in *Person v. Watts, supra,* the function of the judiciary is to render judgments which it can enforce by its own process, not to announce its determination of ethical questions which the losing party to the controversy may lawfully ignore if it should see fit to do so.

As Justice Stacy, later Chief Justice, observed in his dissenting opinion in *State v. Bell,* 184 N.C. 701, 719, 115 S.E. 190 (1922): "The people of North Carolina have ordained in their Constitution * * * that the legislative, executive and supreme judicial powers of the Government should be and ought to remain forever separate and distinct from each other. * * * From this unique political division results our elaborate system of checks and balances. * * * In short, it is one of the distinct American contributions to the science of government; *and the judiciary—the department of trial and judgment—of all others, without hesitation or turning, should hold fast to the basic principle upon which this Government is founded.*" (Emphasis added.)

Smith v. State

This is no longer a matter of jurisprudential speculation. The turmoil in our public school system, the ominous upswing in crime, the smouldering racial animosities, the deterioration of our election processes are eloquent in their testimony as to the results which follow from judicial usurpation of the power to amend the Constitution of the United States and to serve as a super-legislature. It serves no purpose for us to wring our hands over the excesses of the "Warren Court" if we, in a similar zest for putting into effect our concept of justice and the dictates of our conscience, embark upon a like course in disregard of "the basic principle upon which this Government is founded." The road to judicial dictatorship is also paved with good intentions.

A relatively minor flaw in the present decision is seen in the sentence: "Thus, in this case, and in causes of action on contract arising after the filing date of his opinion, 2 March 1976, the doctrine of sovereign immunity will not be a defense to the State. The State will occupy the same position as any other litigant." I assume this means that this decision will be applicable to, but only to, Dr. Smith's case and others in which it is alleged that the State broke its contract *after the date of this decision,* irrespective of when the contract was made.

If the doctrine of sovereign immunity, said, I think erroneously, to be judge-made law, was not correct when "made," it never has been a valid part of the law of North Carolina and should not be a defense to the State in an action for breach of contract, tried hereafter, regardless of when the breach is alleged to have occurred. If this doctrine was correct when "made," it entered into and became a part of the law of this State and to change it is an exercise of the legislative power, no part of which has been conferred upon this Court by the people of North Carolina. A pronouncement that yesterday the law was thus and so but tomorrow it will be otherwise is the classic example of the exercise of legislative power. Furthermore, for this Court to say, "Well, sovereign immunity always was bad law, but we will apply it to Joe Jones' claim for breach of contract when it comes up for trial next week because the alleged breach occurred last month, but we will not apply it to Dr. Smith's case which arose last year or to Sam Green's, where the breach occurs tomorrow," is gross and unconstitutional discrimination, which violates another provision of our Constitution, Article I, Section 19.

Another relatively minor error in the decision is the limitation of the demise of sovereign immunity to actions on contracts. If the courts of North Carolina have jurisdiction to hear and determine Dr. Smith's suit for alleged wrongful discharge from employment, why not Joe Jones' suit for trespass, negligent injury to person or property, or malicious prosecution?

The majority opinion says the General Assembly, by authorizing the Executive Department to enter into a contract, showed its intent to permit suit for its breach. Of course, the simple answer to this is that it just isn't true. It is certainly true that any contract of this State now in existence, or recently broken, if any has been broken, was made and authorized at a time when the members of the General Assembly and all the judges of the State's courts knew the doctrine of sovereign immunity was applied by the courts of North Carolina to suits against the State, except where the General Assembly expressly authorized suit to be brought. This decision simply cannot be supported by any implied legislative intent to authorize a discharged employee to sue for damages. Whatever may have been the case in our sister states, on whose decisions the majority opinion relies, the North Carolina General Assembly knew better. Since the Court decided *Wilson v. Jenkins, supra,* one hundred years ago, there has not, until this day, been any doubt that even the holder of a bond, issued in the name of the State, could not maintain a suit to compel its payment without permission of the General Assembly.

If any further refutation of the majority's theory of implied legislative intent to authorize suit on any authorized State contract were needed, it may be found in the majority opinion itself. As the majority opinion states, the General Assembly has "consented to be sued in many important contractual situations," G.S. 143-135.3, G.S. 136-29(b), G.S. 115-142(n), G.S. 153A-11 and G.S. 160-11 being cited as examples. It would indeed be strange legislative practice to adopt legislation, expressly authorizing resort to the courts for alleged breaches of specified types of authorized contracts, if the Legislature was under the impression that such suit could be brought for breach of *any* authorized contract.

The majority opinion says, "Any other decision by this Court could only serve as a warning to any person, whose services the State seeks to obtain, that he will change his position and rely upon 'the full faith and credit' of the sovereign State

of North Carolina at his peril, for it has reserved the right to breach his contract." The majority is unduly apprehensive about the effect of a contrary decision upon the credit of North Carolina. As noted above, this Court held, one hundred years ago, in *Wilson v. Jenkins, supra,* the holder of bonds issued in the name of North Carolina cannot sue thereon if, after the bonds are issued, the Legislature forbids their payment. Until today that decision has been the law of North Carolina. In the intervening century, hundreds of millions of dollars have been invested in North Carolina's bonds for construction of highways, schools, hospitals and State Government buildings. Despite *Wilson v. Jenkins, supra,* those bonds still outstanding are rated Triple A. The credit of this State rests upon a foundation much more solid than the expectations of the other party to its contract that he can sue to enforce it.

In *Steelman v. City of New Bern,* 279 N.C. 589, 184 S.E. 2d 239 (1971), the question before us was not the right of an injured person to sue the State, but his right to sue a municipality. It may well be that the "judge-made" extension of the doctrine of sovereign immunity to cities and towns was unsound, a point not now before us, for here we are dealing with the doctrine in its purest form, a suit against the State, itself, yet there we said unanimously:

"It is true that the doctrine was first adopted in North Carolina by this Court. However, this judge-made doctrine is firmly established in our law today, and by legislation has been recognized by the General Assembly as the public policy of the State. See, *Galligan v. Town of Chapel Hill,* 276 N.C. 172, 171 S.E. 2d 427 (1969). See also G.S. 160-191.1 * * *

"* * * The General Assembly has modified the doctrine but has never abolished it. *In fact a bill was introduced in the 1971 General Assembly to abolish governmental immunity in its entirety, but this bill failed to pass.* (Emphasis added.)

"It may well be that the logic of the doctrine of sovereign immunity is unsound and that the reasons which led to its adoption are not as forceful today as they were when it was adopted. *However, despite our sympathy for the plaintiff in this case, we feel that any further modification or the repeal of the doctrine of sovereign immunity should*

Smith v. State

*come from the General Assembly, not this Court."* (Emphasis added.)

This was sound jurisprudence, in the opinion of every member of this Court, in 1971. What has happened in the last five years to make it unsound now in application to a much stronger case for sovereign immunity—a suit against the State itself?

I see no error in *Steelman v. City of New Bern, supra,* except its confusion of sovereign immunity with municipal immunity. It was not sovereign immunity but *municipal* immunity which was "judge-made" in England in the case of *Russell v. Men of Devon,* 2 T.R. 667, 100 Eng. Rep. R. 359 (1788), mistakenly, I think, said by us, in *Steelman v. City of New Bern, supra,* to have been the origin of the doctrine of *sovereign* immunity. Likewise, it was not *sovereign* immunity but *municipal* immunity which was first rejected by this Court in *Meares v. Wilmington,* 31 N.C. 73 (1848), and in *Wright v. Wilmington,* 92 N.C. 156 (1885), and then accepted in *Moffitt v. Asheville,* 103 N.C. 237, 9 S.E. 695 (1889). In *Steelman v. City of New Bern, supra,* we failed to note the distinction.

The doctrine of sovereign immunity is not, in my opinion, "judge-made" law, but the natural, inherent attribute of sovereignty. As our opinion in *Steelman v. City of New Bern, supra,* said, "In feudal England the monarchy was sovereign and could not be held liable for damage to its subjects." Why? Not, as we erroneously said in *Steelman v. City of New Bern, supra,* "on the theory that the king could do no wrong." Of course he could, but he could not be sued in *his* courts, because the courts had no jurisdiction the king did not see fit to confer upon them. The courts were his instrumentalities, not his superiors. A subject who deemed himself wronged by the king could petition the king for redress, but could not sue the king without the king's consent. Thus, sovereign immunity antedated *Russell v. Men of Devon* by at least five centuries and was not judge-made, but sovereign-made law. It was the common law of England, axiomatically, long before the American Declaration of Independence and so was brought into our law by G.S. 4-1 and, so far as I have been able to ascertain, was not rejected by any decision of this Court prior to today.

It is said the doctrine is contrary to the American concept of democracy. Not so! Sovereignty is not an un-American concept. What is American is the concept that the State, i.e., the

people in their collective capacity, is the sovereign. What is equally American is the concept that the courts, including this Court, are not the sovereign but the mere instruments of the sovereign, having no inherent powers by Divine Right nor by virtue of superior wisdom or purer ethics, but having only the jurisdiction conferred upon them by the sovereign. Our sovereign, the State of North Carolina, has conferred upon us no jurisdiction to entertain suits against it for damages for an alleged wrongful discharge of an employee of the Executive Department. By the present decision we are seizing that power in violation of the Constitution of North Carolina, Article I, Sec. 6, and, thereby, endangering the liberties of our people according to Article I, Sec. 35.

A contrary decision would not endanger the credit of the State or hamper the Executive Department unduly in the re-cruitment of employees. A contrary decision would not bar Dr. Smith from compensation for whatever wrong may have been done him, for the Constitution, in Article I, Sec. 12, expressly gives him the right "to apply to the General Assembly for re-dress of grievances," a branch of the State Government, inci-dentally, which is, at present, overwhelmingly controlled by members of a political party different from that of the Gov-ernor. It is idle to talk in this connection about delay in the legislative process. If Dr. Smith has been mistreated by a wrong-ful discharge, the Legislature, about to reconvene, can give him relief much more rapidly than the courts. Nor would a contrary decision by this Court preserve inviolate the doctrine of sov-ereign immunity. The sovereign can always consent to be sued. The policy-making arm of our sovereign is the General Assem-bly. Nothing whatsoever prevents it from repealing the doctrine of sovereign immunity in its entirety, or piecemeal, if it believes that course wise. Certainly, it will so act if the majority's fear of ruination of the State's credit and destruction of its ability to employ competent servants turns out to be well founded, in-stead of the mere nightmare I believe our history shows it to be.

I concur in that portion of the majority opinion which de-clares that this Court no longer has original jurisdiction to de-termine claims against the State and make recommendations to the General Assembly with reference to the payment thereof. Such jurisdiction was first conferred upon this Court by the North Carolina Constitution of 1868. See, *Lacy v. State, supra.* Thereby, our sovereign, the people of the State, recognized the

doctrine of sovereign immunity by limiting it mildly. This limitation upon the doctrine was withdrawn by the Amendment of Article IV of the Constitution by the people, our sovereign, in 1970, and is not contained in the present Constitution of North Carolina.

It is quite clear that prior to the Constitution of 1868 no court had jurisdiction to hear and determine a claim against the State of North Carolina for an alleged breach of contract. From 1868 to 1971, this Court, and this Court only, had original jurisdiction to hear such claims and determine *questions of law* relating thereto and it could do no more than make recommendations to the General Assembly for its action thereon. Since 1971 this Court has not even that jurisdiction. The withdrawal of that limited jurisdiction from this Court may not fairly and reasonably be deemed a grant to the Superior Court of jurisdiction to hear and *adjudicate* such claims.