N.C. MONROE CONSTRUCTION COMPANY, PLAINTIFF AND THIRD-PARTY PLAINTIFF V. THE STATE OF NORTH CAROLINA; THE OFFICE OF STATE BUDGET AND MANAGEMENT; AND MARVIN K. DORMAN, JR., IN HIS CAPACITY AS STATE BUDGET DIRECTOR, DEFENDANTS, AND DEWBERRY & DAVIS AND MILLER BUILDING CORPORATION, THIRD-PARTY DEFENDANTS

No. COA01-1478

(Filed 31 December 2002)

**1. Appeal and Error—appealability—partial summary judgment—certification**

A prison construction claim was immediately appealable where the trial court granted a motion for summary judgment from the State, which did not dispose of all the claims in the case, but the court certified that there was no just reason for delay.

**2. Contracts—prison construction—valid only after bond referendum and ratification**

An agreement for plaintiff to serve as program manager for prison construction was valid where it was entered into after voters approved a bond act and the General Assembly ratified a revenue act which expressly authorized contracts for Correction facilities. An earlier agreement was without authority.

**3. Contracts—prison construction—two part appropriation—contract for entire amount—second part contingent**

Plaintiff was entitled to perform the entirety of its duties as program manager for prison construction for the State of North Carolina where the State contended that plaintiff's contract could not have been valid for a portion of the funds enacted but not appropriated. While an agency may not commit the State to spending funds not appropriated, the plain language of the agreement limited plaintiff's ability to perform as to these funds until they were appropriated, which was eventually done.

**4. State—contracts—two part appropriation—initial contract for entire amount**

The language of the 1991 Revenue Act granted authority to the Office of State Budget and Management to contract for the entire of amount of bonds for prison construction, even though later enactments claimed to prevent agencies from contracting for services with some of the funds.

### 5. Contracts—State construction—oversight agency changed— contract not invalidated

The 1993 transfer of authority to oversee a State prison construction program from one agency (OSBM) to another (OSC) did not invalidate a 1991 contract between plaintiff and OSBM establishing plaintiff as the program manager for the entire project. The 1991 agreement specifically encompassed the entire amount of the project, including the portion not appropriated until 1993, and OSBM entered into the contract with plaintiff on behalf of the State. Simply transferring authority to carry out the particulars of the program from one State agency to another does not allow the State to disregard the provisions of the 1991 agreement.

### 6. Contracts—State construction—two part appropriation— oversight agency changed

The State's action in not allowing plaintiff to perform the remainder of a 1991 contract to serve as program manager for prison construction was a breach of contract, for which plaintiff was entitled to damages, where the funds were appropriated in two parts, the state agency overseeing the program was changed with the second appropriation, and the State claimed that the 1991 contract with plaintiff was therefore invalid.

### 7. Contract—mutual mistake—State construction contract— change of oversight agency—funds not yet appropriated

The defense of mistake of fact did not apply to a State construction contract for which money was appropriated in two parts, with the oversight agency changing with the second appropriation, even though the State contended that there was a mutual mistake in the belief that the original agency would continue to administer the project and that there was authority to enter into a contract for the use of funds not yet appropriated. The transfer of oversight from one agency to another was irrelevant because the contract was with the State, and the contract was authorized because it was contingent on funds being appropriated.

### 8. Contracts-quasi-contract—not an affirmative defense

The State's argument of unjust enrichment as a defense to its own termination of a contract was misplaced; unjust enrichment is a quasi-contractual theory of recovery, not an affirmative defense.

Appeal by plaintiff from judgment entered 20 August 2001 by Judge John R. Jolly, Jr. in Superior Court, Wake County. Heard in the Court of Appeals 11 September 2002.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Michael D. Meeker, Clinton R. Pinyan, and Andrew J. Haile, for plaintiff-appellant.*

> *Attorney General Roy Cooper, by Special Deputy Attorney General Roy A. Giles, Jr. and Assistant Attorney General Jeffrey B. Parsons, for the State.*

McGEE, Judge.

In response to a federal court mandate to promptly relieve prison facility overcrowding in North Carolina, the General Assembly enacted legislation in 1987 that transferred the responsibility and authority to design and construct prisons from the Office of State Construction (OSC) to the Office of State Budget and Management (OSBM) and exempted prison construction from various statutory requirements to help expedite prison construction. OSBM began discussions in 1987 with N.C. Monroe Construction Company (plaintiff) about building prisons for the State.

The General Assembly enacted the State Prison and Youth Facilities Bond Act, ch. 935, 1989 N.C. Sess. Laws 294 (Bond Act) on 16 July 1990. The Bond Act authorized the issuance of $200 million in state bonds, pending voter approval in November 1990. The Bond Act did not explicitly authorize State agencies to enter into contracts for the expenditure of bond proceeds, but reserved to the General Assembly the power to provide such authorization at a later date.

Plaintiff and the State entered into a management agreement on 1 August 1990 (August 1990 Agreement). C.C. Cameron, head of OSBM and Executive Assistant to the Governor for Budget and Management, negotiated and executed the August 1990 Agreement for the State. The August 1990 Agreement established plaintiff as program manager "for services in connection with the construction of those facilities described in Section 6 of . . . the State Prison and Youth Services Facilities Bond Act . . . ." Section 6 of the Bond Act provided that

> [t]he proceeds of bonds and notes shall be allocated and expended for the purposes of paying the cost of prison and youth services facilities as provided in this act, the particular projects

within such purposes and the projected allocations therefor to be determined by legislative action of the General Assembly at the 1991 session or any subsequent session.

§ 6, ch. 935, 1989 N.C. Sess. Laws 294, 298. North Carolina voters approved the Bond Act on 6 November 1990. C.C. Cameron left state government service the following month and was replaced by Marvin Dorman (Dorman), formerly second in command at OSBM as the Deputy State Budget Officer.

The General Assembly ratified the Appropriations and Budget Revenue Act of 1991, ch. 689, 1991 N.C. Sess. Laws 1894 (Revenue Act), on 13 July 1991. The Revenue Act provided for the appropriation of $112.5 million in bonds for

> financing the cost of . . . State prison facilities and youth services facilities, including, without limitation, the cost of constructing capital facilities, renovating or reconstructing existing facilities, acquiring equipment related thereto, purchasing land, paying costs of issuance bonds and notes and paying contractual services necessary for the partial implementation of the purposes of the bond act.

§ 239(a), ch. 689, 1991 N.C. Sess. Laws 1894, 2125. Section 239 of the Revenue Act allocated $103.4 million of the $112.5 million towards the construction of prison projects in the State and the remainder to construction projects in the Division of Youth Services. *Id.* at 2125-26. Section 239 left the remaining $87.5 million of the overall $200 million to be used as determined by subsequent legislative action during that same session or any later session of the General Assembly. *Id.* Section 239(f) granted OSBM the ability to contract for prison facilities, stating that

> [w]ith respect to facilities authorized for the Department of Correction, the Office of State Budget and Management may contract for and supervise all aspects of administration, technical assistance, design, construction or demolition of prison facilities in order to implement the providing of prison facilities under the provisions of this act.

*Id.* at 2127.

At the request of Dorman, plaintiff and the State executed a second contract on 18 September 1991 (September 1991 Agreement), covering the same general services as the August 1990 Agreement,

with two significant differences. First, both the August 1990 Agreement and the September 1991 Agreement name the State and plaintiff as the parties to the contract and state that the contract is

> for services in connection with the construction of those facilities described in Section 6 of . . . [the] Bond Act (200 Million Bond Issue), as enacted during the 1989 Session (May 1990 Session) of the North Carolina General Assembly . . ., a copy which is attached hereto.

However, the September 1991 Agreement includes a provision immediately after the above cited language that specifies the contract includes the entire $200 million under the Bond Act and gives the rationale for including the entire amount. The provision includes facilities

> for which appropriations have been made for the Department of Corrections pursuant to Section 239(c) in House Bill 83 as enacted in the 1991 Session of the North Carolina General Assembly, *as well as the facilities for which appropriations shall be made for the balance of the $87,500,000 authorized as part of the 200 Million Bond Issue.*

> The facilities for which appropriations have not been made are being contracted for because a) a portion of the appropriations which are to be subsequently made will be necessary to complete the facilities authorized by the current appropriation, b) *planning for the entire 200 Million Bond Issue will substantially decrease delays which would otherwise occur in construction of facilities for which appropriations are to be made subsequently, and c) savings will be realized by the State of North Carolina as a result of the economy of scale for the total 200 Million Bond Issue.*

(emphasis added).

A second key addition in the September 1991 Agreement was to section 6.1, which originally established the reimbursement rate for the initial $103.4 million portion of the construction project. A provision was added governing the reimbursement rate for the remaining portions of the $200 million when appropriated by the General Assembly.

At the request of the General Assembly, Dorman presented a list of prison projects to be constructed from the remaining $87.5 million

to the Senate Finance Committee on 4 June 1992. However, the General Assembly did not appropriate funds for those projects at that time. The General Assembly enacted the Act of July 24, 1992, ch. 1036, 1991 Sess. Laws 1106 (1992 Appropriations Act), which gave the General Assembly the discretion to select the particular projects on which the remaining $87.5 million would be spent, provided that expenditures should not be made, nor contracts entered into concerning the remaining $87.5 million until the General Assembly enacted a schedule for those funds; the Act directed OSC to consider alternative delivery systems that could expedite the construction of prison facilities. The following day, 25 July 1992, the General Assembly rewrote the Revenue Act, changing the list of facilities approved under section 239(c) of the original bill and, under section 239(f), requiring OSBM to include OSC, the Department of Correction, and the Department of Insurance in the construction process under the Bond Act. Capital Improvements Appropriations Act of 1992, ch. 1044, § 41, 1991 N.C. Sess. Laws 1158, 1202-05.

Almost a year later, the General Assembly ratified the Act of July 24, 1993, ch. 550, 1993 N.C. Sess. Laws 2906 (1993 Appropriations Act), which replaced OSBM with OSC as the agency authorized to contract for and supervise construction of prison facilities. The 1993 Appropriations Act also appropriated the remaining $87.5 million from the Bond Act and repealed sections 1 through 4 of the 1992 Appropriations Act. The General Assembly eliminated the prohibitions on entering into contracts from the portion of section 2 of the 1993 Appropriations Act, analogous to the portion of repealed section 2 of the 1992 Appropriations Act.

Plaintiff was informed its services would no longer be needed in conjunction with the construction of facilities under the Bond Act. Plaintiff was paid for all work it had performed under the $103.4 million portion of the project. Plaintiff submitted claims for payment under the $87.5 million portion of the Bond Act to OSBM on 14 May 1997, and to OSC on 1 July 1997, both of which were denied.

Plaintiff filed a complaint on 22 May 1998 seeking damages for breach of contract by the State. The State filed an answer and counterclaim on 2 September 1998. The State filed a motion for summary judgment dated 31 May 2000. Plaintiff filed an affidavit of its president, Carl Monroe, dated 4 January 2001. The State moved to strike portions of the affidavit on 10 January 2001. The trial court entered an order on 2 August 2001 denying the State's motion to strike and granting the State's motion for summary judgment. Plaintiff filed a motion

to amend the judgment on 6 August 2001, seeking a finding and conclusion that there was no just reason for delay in entry of a final judgment as to one or more but fewer than all of the claims or the parties, pursuant to N.C. Gen. Stat. § 1A-1, Rule 54(b). The trial court granted plaintiff's motion and added the requested finding to the revised judgment entered on 20 August 2001. Plaintiff appeals from the revised judgment.

[1] We must first determine whether the amended order of the trial court is immediately appealable. The order of the trial court granting the State's motion for summary judgment did not dispose of all the claims in this case, in particular counterclaims and third-party claims, which makes it an interlocutory order. *Veazey v. Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950). N.C. Gen. Stat. § 1A-1, Rule 54(b) (2001) states that in an action involving multiple claims or parties, if the trial court enters a final judgment as to a claim or a party and certifies there is no just reason for delay, the judgment is immediately appealable, requiring appellate review. *DKH Corp. v. Rankin-Patterson Oil Co.*, 348 N.C. 583, 585, 500 S.E.2d 666, 668 (1998). The trial court may render its judgment immediately appealable by a Rule 54(b) certification only if the judgment is final. *Sharpe v. Worland*, 351 N.C. 159, 162, 522 S.E.2d 577, 579 (1999). In the case before us, the trial court in its amended judgment correctly made a finding of fact and conclusion of law that its judgment was a final judgment as to plaintiff's claims against the State and certified there was no just reason for delay, thus requiring review on appeal by this Court.

Plaintiff argues that the trial court erred in granting summary judgment to the State because there is a genuine issue of material fact as to whether the State breached or wrongfully terminated valid and enforceable agreements for plaintiff to serve as program manager for the construction of prisons in North Carolina. The State responds that the trial court correctly granted its motion for summary judgment since the legislative enactments in the record show that OSBM had no authority to enter into a contract with plaintiff with respect to the $87.5 million portion of the bond program. The State therefore argues that with no authority to enter into a valid contract, "the State is immune from suit in relation to the $87.5 million portion of the bond program."

Summary judgment should be granted only when no genuine issue of material fact is presented. *Gaskill v. Jennette Enters., Inc.*, 147 N.C. App. 138, 140, 554 S.E.2d 10, 12 (2001), *disc. review denied*, 355 N.C. 211, 559 S.E.2d 801 (2002). "On appeal, this Court must view

the record in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Aetna Casualty & Surety Co. v. Welch*, 92 N.C. App. 211, 213, 373 S.E.2d 887, 888 (1988)).

**[2]** The State contends that only the September 1991 Agreement is a valid contract. We agree. OSBM had no authority to enter into the August 1990 Agreement since the voters of North Carolina had not yet approved the bond referendum authorizing the bond issuance. *See Whitfield v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998) (the State is liable only for *"valid"* contracts that are " *'authorized by law'* ") (quoting *Smith v. State*, 289 N.C. 303, 322, 222 S.E.2d 412, 425 (1976)). However, in September 1991, the State entered into a second agreement with plaintiff, the September 1991 Agreement. By that time, OSBM had authority to enter into agreements on behalf of the State concerning the construction of prisons under the Bond Act, since the North Carolina voters approved the Bond Act on 6 November 1990 and the General Assembly ratified the Revenue Act on 13 July 1991, which expressly granted authority to OSBM to enter into contracts on behalf of the State with respect to "facilities authorized for the Department of Correction." § 239(f), ch. 689, 1991 N.C. Sess. Laws 1894, 2127.

**[3]** We next review whether OSBM had authority to enter into a contract for the $87.5 million portion of the Bond Act, in addition to the $103.4 million covered by the September 1991 Agreement. Plaintiff argues that section 239(f) of the Revenue Act granted OSBM the ability to contract for all prison facilities under the Bond Act, and that no language in the Revenue Act limits this authority. Section 239(f) states that

> [w]ith respect to facilities authorized for the Department of Correction, the Office of State Budget and Management may contract for and supervise all aspects of administration, technical assistance, design, construction or demolition of prison facilities in order to implement the providing of prison facilities under the provisions of this act . . . .

*Id.*

The State asserts several arguments as to why the attempt of OSBM to enter into a contract covering the $87.5 million was invalid. The State first argues that it could not enter into a contract for the $87.5 million without a legislative appropriation already in place. In

support of its argument the State cites N.C. Gen. Stat. § 143-16.3, *Whitfield,* 348 N.C. at 42, 497 S.E.2d at 415, and *Smith,* 289 N.C. at 322, 497 S.E.2d at 425. The State, however, mischaracterizes the language of N.C.G.S. § 143-16.3 by stating in its brief that the statute prohibits a state agency from "commit[ting] the State to the expenditure of funds which have not been appropriated for the purpose of the contract." The pertinent portion of N.C. Gen. Stat. § 143-16.3 (2001) states that "no funds from any source . . . may be expended for any new or expanded purpose, position or other expenditure for which the General Assembly has considered but not enacted an appropriation of funds for the current fiscal budget." N.C.G.S. § 143-16.3 only prohibits the actual expenditure of funds if not appropriated. As both parties acknowledge, the $87.5 million was not expended before funds were appropriated. In fact, the September 1991 Agreement stated that notices to proceed for the remaining $87.5 million portion of the bond program work were not to be issued until no later than thirty days after appropriations were made for that portion of the program.

The State contends that because of this language, the September 1991 Agreement by its terms "tied [plaintiff's] performance of duties for that portion of the bond program to subsequent legislative enactments." The State attempts to expand the language in the September 1991 Agreement to encompass any subsequent legislative enactments. We disagree with this characterization. The plain terms of the above cited language limit plaintiff's ability to perform the September 1991 Agreement only in that plaintiff could not perform as to the remaining $87.5 million until the General Assembly appropriated those funds. If the General Assembly had not appropriated the funds, then plaintiff could not have performed on the remainder of the $87.5 million. Despite several interceding legislative enactments affecting the ability of the General Assembly to appropriate the bond program's remaining funds, and the transfer of State oversight to OSC, the General Assembly did appropriate the $87.5 million on 24 July 1993. According to the terms of the September 1991 Agreement, plaintiff was entitled to perform its duties for the $87.5 million portion of the Bond Act upon appropriation.

[4] The State next argues that OSBM did not have authority to enter into the portions of the September 1991 Agreement in which services covering the $87.5 million were addressed. "Only when the State has implicitly waived sovereign immunity by *expressly* entering into a *valid* contract through an agent of the State expressly authorized by

law to enter into such contract may a plaintiff proceed with a claim against the State upon the State's breach." *Whitfield*, 348 N.C. at 43, 497 S.E.2d at 415 (citing *Smith*, 289 N.C. at 322, 222 S.E.2d at 425). Thus if OSBM had never been granted authority to enter into a contract covering the $87.5 million, plaintiff could not proceed with its claim against the State.

As discussed above, the State had the power to authorize agencies to enter into contracts concerning the $200 million under the Bond Act. Plaintiff argues that the General Assembly, through section 239(f) of the Revenue Act granted this authorization to OSBM. The State essentially argues that OSBM was not expressly authorized to enter into a contract for the $87.5 million. There is no dispute that the legislative enactments claiming to prevent agencies from contracting for services under the $87.5 million were enacted well after the effective date of the September 1991 Agreement. Further, it is undisputed that no such explicit limitations as those in the 1992 Appropriations Act were present in legislation at the time the September 1991 Agreement was executed. The facts surrounding the circumstances of what legislative enactments were in place at the time the September 1991 Agreement was executed are not in dispute. The determinative issue is whether section 239(f) of the Revenue Act granted authority to OSBM to enter into contracts involving the entire $200 million under the Bond Act. While the language of section 239(f) could have been drafted more clearly, we interpret the section to grant authority to OSBM to contract for the entire $200 million. Therefore, as a matter of law, the portion of the September 1991 Agreement governing the $87.5 million was part of a valid contract, authorized by law. The State is therefore not entitled to summary judgment.

**[5]** The State argues that when the General Assembly finally appropriated the balance of the bond funds, it did so through OSC, not OSBM, and that this appropriation to an alternate state agency rendered invalid any potential authorization through the September 1991 Agreement. The State in effect argues that because OSBM entered into the contract on behalf of the State, that by transferring authority to enter into such construction contracts, as well as authority to manage the prison construction project from OSBM to OSC, the State does not have to honor the construction contract with plaintiff that it entered into through OSBM. We disagree.

The September 1991 Agreement contains language that specifically encompasses the entire $200 million, including the $87.5 million at issue in this case. OSBM entered into this contract with plaintiff;

however, it did so on behalf of the State. At all relevant points in the contract, the parties named are plaintiff and the State. The September 1991 Agreement is a contract between plaintiff and the State. Simply transferring authority to carry out the particulars of a program covered by this contract from one state agency to another does not allow the State to disregard the provisions in the September 1991 Agreement. We hold that the transfer of authority from one state agency to another to oversee the prison construction project does not invalidate the September 1991 Agreement between plaintiff and the State.

[6] Plaintiff was informed by Dorman that it would no longer be used as the project manager for the remaining portions of the construction project, despite the September 1991 Agreement. It is undisputed that the State did not use plaintiff as program manager for the remaining $87.5 million under the Bond Act. "[W]hen the State has implicitly waived sovereign immunity by *expressly* entering into a *valid* contract through an agent of the State expressly authorized by law to enter into such contract . . . a plaintiff [may] proceed with a claim against the State upon the State's breach." *Whitfield*, 348 N.C. at 43, 497 S.E.2d at 415 (citing *Smith*, 289 N.C. at 322, 222 S.E.2d at 425). As determined above, the State had entered into a valid contract, authorized by law. The State's action in not allowing plaintiff to perform the remainder of the September 1991 Agreement was a breach of that contract, for which plaintiff is entitled to damages.

[7] The State argues, however, there are affirmative defenses that prevent plaintiff from recovering as a result of the State's failure to use plaintiff as project manager for the $87.5 million portion of the construction project. The State argues a mutual mistake of fact as a defense barring plaintiff's breach of contract claim. As this Court stated in *Lancaster v. Lancaster*,

> [i]t is well established that the existence of a mutual mistake as to a material fact comprising the essence of the agreement will provide grounds to rescind a contract. *See Mullinax v. Fieldcrest Cannon, Inc.*, 100 N.C. App. 248, 251, 395 S.E.2d 160, 162 (1990). "A mutual mistake of fact is a mistake 'common to both parties and by reason of it each has done what neither intended.'" *Swain v. C & N Evans Trucking Co., Inc.*, 126 N.C. App. 332, 335, 484 S.E.2d 845, 848 (1997) (citation omitted).

138 N.C. App. 459, 465, 530 S.E.2d 82, 86 (2000).

N.C. MONROE CONSTR. CO. v. STATE

[155 N.C. App. 320 (2002)]

Plaintiff argues that the State cannot avoid its obligations under the September 1991 Agreement by claiming that both parties were mistaken in believing that OSBM would continue to administer the construction project. We have already determined that the contract involved is one between plaintiff and the State, and that the transfer of oversight authority from OSBM to OSC was thus irrelevant for purposes of enforcing the September 1991 Agreement. Furthermore,

> to justify a recision of a contract for a mutual mistake of fact, the mistake must concern facts as they existed at the time of the making of the contract; reliance on a prediction as to future events will not support a claim for recision based on mutual mistake of fact.

*Opsahl v. Pinehurst Inc.*, 81 N.C. App. 56, 62, 344 S.E.2d 68, 72 (1986), *disc. review improvidently allowed*, 319 N.C. 222, 353 S.E.2d 400 (1987) (citations omitted). The transfer of authority to administer the prison construction project from OSBM to OSC was the type of "future event" that does not support a claim of mutual mistake of fact.

However, the State argues that the parties were mistaken as to whether OSBM originally had authority to enter into the portion of the September 1991 Agreement purporting to cover the $87.5 million. As discussed above, the State had authority to authorize an agency to enter into a contract for the remaining $87.5 million since it was contingent on those funds being appropriated. Further, we have already determined that OSBM was expressly authorized by the State to enter into a contract that encompassed the $87.5 million portion of the Bond Act on 18 September 1991. Therefore, the State's defense based on mutual mistake of fact is without merit.

[8] The State next argues "the affirmative defense of unjust enrichment." Unjust enrichment, however, is a quasi-contractual theory of recovery, not an affirmative defense. *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). Further, unjust enrichment applies in the absence of a contract. *Lagies v. Myers*, 142 N.C. App. 239, 254, 542 S.E.2d 336, 345, *disc. review denied*, 353 N.C. 526, 549 S.E.2d 218 (2001) (citation omitted). The State's attempt to argue unjust enrichment as a defense to its own termination of a contract is misplaced. The State's argument of an affirmative defense of unjust enrichment is also without merit.

In summary, we hold that: (1) the terms of the September 1991 Agreement covered the entire $200 million of the Bond Act; (2) based

on the undisputed facts, OSBM had been granted authority by the General Assembly to enter into contracts covering the entire $200 million under the Bond Act and thus the September 1991 Agreement was a valid contract authorized by law, *see Whitfield*, 348 N.C. at 42-43, 497 S.E.2d at 415; (3) transferring authority to oversee the prison construction project from OSBM to OSC did not invalidate the September 1991 Agreement; and (4) the State's termination of the September 1991 Agreement was a breach of contract. "In the appropriate case, summary judgment may be rendered against the moving party." *Candid Camera Video v. Matthews*, 76 N.C. App. 634, 637, 334 S.E.2d 94, 96 (1985), *disc. review denied*, 315 N.C. 390, 338 S.E.2d 879 (1986) (citation omitted). Therefore, we reverse the trial court's grant of summary judgment for the State, and remand to the trial court with instructions to grant summary judgment for plaintiff and to determine plaintiff's damages.

We need not address plaintiff's remaining assignments of error in view of our above determinations.

Reversed and remanded.

Judges GREENE and THOMAS concur.