A.H. BECK FOUNDATION COMPANY, INC., PLAINTIFF v. JONES BROS., INC., AND AMERICAN HOME ASSURANCE CO., DEFENDANTS, JONES BROS., INC., THIRD-PARTY PLAINTIFF v. NORTH CAROLINA DEPARTMENT OF TRANSPORTATION, THIRD-PARTY DEFENDANT

No. COA03-1431

(Filed 2 November 2004)

**Highways and Streets— highway construction contract—subject matter jurisdiction—motion to dismiss third-party complaint—equitable estoppel**

A de novo review revealed that the trial court erred in an action arising out of highway construction by denying third-party defendant North Carolina Department of Transportation's (NC DOT) motion to dismiss based on lack of subject matter jurisdiction third-party plaintiff company's complaint to recover damages in the amount of $7,973,528.14 or an amount not less than plaintiff subcontractor may be awarded as a result of its complaint against defendant/third-party plaintiff, because: (1) third-party plaintiffs failed to follow the statutory procedures under N.C.G.S. § 136-29 which are required to file a complaint against NC DOT; (2) notwithstanding the requirement that the final statement for work performed under the construction con-

A.H. BECK FOUND. CO. v. JONES BROS., INC.

[166 N.C. App. 672 (2004)]

tract be entitled "The Final Estimate," no provision contained within Section 107-25 of the NC DOT standard specifications for roads and structures or N.C.G.S. Ch. 136 requires that the final statement follow a particular framework, and in the instant case the phrase "final estimate" was written five times within the 19 October 2001 cover letter with its accompanying documents thus satisfying the pertinent requirements; (3) no provision of the standard specifications or N.C.G.S. Ch. 136 required that the retainage payment accompany the final estimate; and (4) NC DOT did not waive its right to contend that third-party plaintiff received the final estimate in the instant case on 24 October 2001, and NC DOT's failure to respond to the pertinent email did not constitute an affirmative act or misrepresentation giving rise to the doctrine of equitable estoppel.

Appeal by the North Carolina Department of Transportation from order entered 21 February 2003 by Judge Larry G. Ford in Rowan County Superior Court. Heard in the Court of Appeals 11 October 2004.

*Klutzz, Reamer, Blankenship, Hayes & Randolph, LLP, by Roman C. Pibl, for defendant-appellee American Home Assurance Co.*

*Womble Carlyle Sandridge & Rice, PLLC, by Burley B. Mitchell, Jr., Sean E. Andrussier, Timothy Barber, and Mark Henriques, and Lewis & McKenna, by Paul Z. Lewis, pro hac vice, for defendant/third-party plaintiff-appellee Jones Brothers, Inc.*

*Attorney General Roy Cooper, by Assistant Attorney General Joseph E. Herrin, for third-party defendant-appellant North Carolina Department of Transportation.*

TIMMONS-GOODSON, Judge.

The North Carolina Department of Transportation ("NCDOT") appeals the trial court order denying its motion to dismiss the third-party complaint of Jones Brothers, Inc. ("Jones"). For the reasons discussed herein, we reverse.

The facts and procedural history pertinent to the instant appeal are as follows: In 1996, NCDOT began receiving bids for Highway Project No. 8.1631701 ("the project"), which involved the construction of a new bridge on Highway 49 over the Yadkin River at

Tuckertown Lake. On 17 December 1996, Jones submitted the lowest bid for the project, and on 5 February 1997, NCDOT awarded Jones a contract to perform the work on the project. Jones subsequently received bids from subcontractors for separate portions of the work required by the project. On 13 February 1997, Jones entered into a subcontract with A.H. Beck Foundation Company, Inc. ("Beck"), whereby Beck would drill vertical subsurface shafts and install casings therein, in order to stabilize and retain the hillside slopes above and adjacent to the roadway approaching the bridge.

In June 1997, Beck began drilling the slope-stabilization shafts and immediately encountered hard, dense rock below the surface. On 6 August 1997, Beck advised Jones that it was encountering significant problems related to the subsurface conditions, and that it would require additional compensation and a time extension in order to complete the work. In response, Jones submitted a claim to NCDOT on Beck's behalf on 11 August 1997. On 20 August 1997, NCDOT Resident Engineer K.E. Raulston ("Raulston") replied by letter as follows:

> I have received your letter dated August 11, 1997, which contained notification of intent to file a claim. The claim is filed on behalf of [Beck] who claim that they are encountering conditions different than that shown in the subsurface plans.

> I refer you to Section 102-07 on the North Carolina Standard Specifications "subsurface information." The department does not warrant or guarantee the accuracy of the subsurface information. The contractor shall have no claim for additional compensation or for an extension of time for any reason resulting from the actual conditions encountered at the site differing from those indicated in the subsurface information. Therefore any claim regarding subsurface conditions is denied.

Beck continued to encounter dense rock at the drill sites, and as a result was unable to finish the slope-stabilization portion of the work until 17 April 1998. Beck thereafter submitted to Jones a "Claim for Adjustment in Compensation Relative to Slope Stabilization Piles," which detailed Beck's "unanticipated delays, disruptions, denials, interference, [and] altered and/or extra work" in the form of "force account records." Jones forwarded Beck's claim to NCDOT on 12 August 1998, but subsequently requested return of the claim. On 15 October 1998, Raulston advised Jones that "initial review of the claim indicates that it would have been denied for the same reason it was

denied the first time." Subsequent claims were filed by Jones on behalf of Beck; however, each claim was denied by NCDOT.

On 23 April 2000, Beck filed a complaint against Jones, alleging, *inter alia*, breach of subcontract, breach of implied warranty, unfair and deceptive trade practices, wrongful termination, and mutual mistake. The complaint requested "at least" $7,973,528.14 in damages. On 10 October 2000, Jones filed an answer, counterclaim, and third-party complaint against NCDOT. In its third-party complaint, Jones alleged that its contract with NCDOT "contained terms and conditions providing for the preparation of Supplemental Agreements and change orders to compensate the contractor for modifications to the contract and any alterations in the plans or the details of construction for extra work, for suspensions of work, and for quantity adjustments." Jones further alleged that "supplemental agreements should have been issued by NCDOT," and that "[t]o the extent that the [project] conditions differ from those represented by NCDOT in its plans and specifications and amount to an alteration of the plans or the details of construction," Jones was entitled to "indemnity and reimbursement from NCDOT in full payment of any and all damages that may be due to Beck."

On 29 January 2001, NCDOT filed a motion to dismiss in lieu of answer. On 2 May 2001, the trial court granted NCDOT's motion to dismiss, concluding that Jones "ha[d] not yet exhausted the administrative remedies provided under N.C.G.S. § 136-29." The trial court granted the motion to dismiss without prejudice to Jones' right to reassert its third-party complaint against NCDOT, "in the event the administrative process does not fully resolve the disputes between the parties."

Jones and NCDOT continued to correspond regarding the resolution of their dispute. On 22 June 2001, R.C. Martin ("Martin"), Jones' Chief Operating Officer, sent to NCDOT "the three completed documents required for the closeout and the release of retainage" on the project, including an affidavit delineating Jones' third-party claim. On 24 September 2001, Martin wrote NCDOT again, whereby he advised NCDOT as follows:

> [W]e are submitting, in accordance with Section 109-10 of the NCDOT Standard Specifications, our intent to continue to pursue the claims filed on behalf of our subcontractor, [Beck]. Their request for additional compensation and time has been filed and received by NCDOT. Upon receipt of our Final Estimate, it is our

intent to file a verified claim for the areas in dispute in accordance with section 107-25.

On 19 October 2001, NCDOT State Construction Engineer Steven D. DeWitt ("DeWitt") sent Jones a letter regarding Jones' claim. The letter was sent via certified mail and its subject line read "Payment of Final Estimate." The letter stated as follows:

Attached is final estimate warrant number 1212064 in the amount of $5,299.81 which represents the final payment of the contract. Also attached for your files is a copy of the final estimate which is your final statement.

As stated, attached to the letter was a check in the amount of $5,299.81 ("final pay warrant") and a copy of estimate number 40 ("Estimate 40"). Estimate 40 was entitled "Contract Final Estimate." Next to the "Remarks" section of Estimate 40 was the phrase "The Final Estimate." Next to the "Percent Complete" section of Estimate 40 was the number 100, and next to the "% Complete By Progress Chart" section of Estimate 40 was the number 100. Estimate 40 further indicated that the "Amount Transferred To Trust Account This Estimate" was $149,420.58.

On 30 October 2001, NCDOT received confirmation through a certified return receipt that the 19 October letter was delivered to Jones on 24 October 2001. On 25 October 2001, Jones tendered the final pay warrant. On 21 December 2001, Martin sent NCDOT Construction Estimates & Claims Engineer Phil Watts ("Watts") an email which stated:

When you have a spare moment, could you please check on the status of Final Quantities and Retainage for the above referenced project, your NCDOT PROJECT 8.1631701. A couple of the subs on the project have contacted us and asked about their retainage. . . . If this reaches you at a bad time with the holidays and year end coming up, when you get a chance after the new year . . . would be appreciated. Otherwise, have a nice Holiday Season and we'll see you next year.

(emphasis in original).

On 3 January 2002, Watts responded via an email which stated:

Yesterday was my first day back to work since Christmas. . . . Regarding the final payment, there was little money coming from DOT but that was sent two months ago. We authorized the trustee

to release the retainage that was in the trust account. If that money has not been received, I recommend you contact the trustee . . . . If they have not received our letter authorizing release of the money, let me know.

On 8 January 2002, Jones sent NCDOT a Verified Claim requesting additional compensation and time and alleging that Beck is "entitled to either an increase in the Subcontract amount by at least $7,973,528.14 or damages for breach of the subcontract in a similar amount." On 11 January 2002, State Highway Administrator Len A. Sanderson ("Sanderson") replied as follows:

This is [in] response to your claim received by my office on January 10, 2002. Unfortunately, the submission cannot be accepted as a verified claim. North Carolina General Statute 136-29 and the contract documents are very stringent that verified claims must be presented to the Highway Administrator within sixty (60) days after receipt of the final estimate payment.

The records reflect the final payment was made to the Jones Bros., Inc. on October 24, 2001, a period of seventy-eight (78) days before the claim was received on January 10, 2002. Thus, Jones Bros., Inc has failed to timely submit the claim. Therefore, I can only return your submission herein without action.

On 4 February 2002, Martin sent NCDOT a letter requesting that NCDOT reconsider its decision in light of "the circumstances surrounding transmission of The Final Estimate[.]" Martin stated that "[o]n further investigation," Jones had "determined that the retainage which was released by your directive was carried by the Escrow Agent as a NCDOT Surry County project which, by coincidence, was closed out roughly at the same time." Martin recounted the email sent to Watts on 21 December 2001 and noted that "NCDOT attorneys did not notify our counsel of [the transmission of the Final Estimate] which also contributed to the confusion." Nevertheless, on 6 February 2002, Sanderson returned Jones' claim and referred Jones to his 11 January 2002 letter.

On 29 April 2002, Jones filed a second third-party complaint against NCDOT. On 30 May 2002, Jones filed an amended third-party complaint against NCDOT, requesting, *inter alia*, that the trial court award Jones damages in the amount of $7,973,528.14, or, in the alternative, no amount less than the amount Beck may be awarded as a result of its complaint against Jones. On 17 July 2002, NCDOT filed a

motion to dismiss in lieu of answer, requesting that the trial court dismiss Jones' complaint pursuant to N.C. Gen. Stat. § 1A-1, Rule 4, N.C. Gen. Stat. § 1A-1, Rule 14, and N.C. Gen. Stat. § 1A-1, Rule 12(a)(1), (b)(1), (b)(2), (b)(6), and (h)(3).

On 21 February 2003, the trial court denied NCDOT's motion to dismiss, concluding that "[b]ecause a properly titled and executed final estimate was not received by [Jones], the time for [Jones] to file a verified claim under N.C.G.S. § 136-29 has not run." The trial court also concluded that "[a]lternatively, to the extent the document submitted on October 19, 2001 did constitute a final estimate . . . the failure of NCDOT to respond to [Martin's] December 21, 2001 e-mail equitably tolled the running of the statute of limitation[,]" and "NCDOT's conduct in improperly titling the final estimate, not executing the final estimate, not including documentation of release of retainage, not including notice regarding the 60-day period, not notifying [Jones'] counsel and not responding to [Martin's] e-mail g[a]ve rise to equitable estoppel." NCDOT appeals.

---

The dispositive issue on appeal is whether the trial court erred in denying NCDOT's motion to dismiss. NCDOT argues that Jones' complaint should have been dismissed for lack of subject matter jurisdiction because Jones failed to follow the statutory procedures required to file a complaint against NCDOT. We agree.

N.C. Gen. Stat. § 1A-1, Rule 12(b)(1) (2003) allows a defendant to raise in a motion to dismiss the affirmative defense of lack of subject matter jurisdiction. "An appellate court's review of an order of the trial court denying or allowing a Rule 12(b)(1) motion is *de novo*, except to the extent the trial court resolves issues of fact and those findings are binding on the appellate court if supported by competent evidence in the record." *Smith v. Privette*, 128 N.C. App. 490, 493, 495 S.E.2d 395, 397, *appeal dismissed*, 348 N.C. 284, 501 S.E.2d 913 (1998). The instant case involves the determination of a question of law, that is, whether the trial court had subject matter jurisdiction over plaintiff's third-party complaint against NCDOT, and thus we review the trial court's decision *de novo*.

"It is an established principle of jurisprudence, resting on grounds of sound public policy, that a state may not be sued in its own courts or elsewhere unless it has consented by statute to be sued or has otherwise waived its immunity from suit." *Battle Ridge Cos. v. N.C. Dep't of Transp.*, 161 N.C. App. 156, 157, 587 S.E.2d 426, 427

(2003), *disc. review denied*, 358 N.C. 233, 594 S.E.2d 191 (2004). In *Smith v. State*, 289 N.C. 303, 310, 222 S.E.2d 412, 418 (1976), our Supreme Court held that, where the state enters into a contract, it implicitly consents to suit for damages resulting from breach of the contract.

N.C. Gen. Stat. § 136-29 was enacted to provide a statutory ground under which contractors may sue NCDOT, and the statute is made a part of every contract for highway construction entered into by NCDOT. *Battle Ridge Cos.*, 161 N.C. App. at 157-58, 587 S.E.2d at 427. This Court has held that "to satisfy G.S. 136-29 the contractor must submit a claim, accompanied by evidence of verification, within the statutory time limit." *E.F. Blankenship Co. v. N.C. Dept. of Transportation*, 79 N.C. App. 462, 464, 339 S.E.2d 439, 441 (1986), *aff'd per curiam*, 318 N.C. 685, 351 S.E.2d 293 (1987). Thus, "[b]efore a party may pursue a judicial action against the state for money claimed to be due under a highway construction contract, it must first pursue its administrative remedies." *In re Huyck Corp. v. Mangum, Inc.*, 309 N.C. 788, 792, 309 S.E.2d 183, 186 (1983).

N.C. Gen. Stat. § 136-29(a) (2003) provides as follows:

A contractor who has completed a contract with the Department of Transportation to construct a State highway and who has not received the amount he claims is due under the contract may submit a verified written claim to the State Highway Administrator for the amount the contractor claims is due. The claim shall be submitted within 60 days after the contractor receives his final statement from the Department[.]

Section 107-25 of the North Carolina Department Of Transportation Standard Specifications For Roads And Structures (2002) ("the Standard Specifications") mirrors the provisions of N.C. Gen. Stat. § 136-29, stating that the verified claim "shall be submitted to the State Highway Administrator within 60 days from the time the Contractor receives the final estimate[.]" Section 101-38 of the Standard Specifications defines a "final estimate" as follows:

The document which contains a final statement of all quantities and total dollar amount for each item of work performed during the life of the contract including any adjustments to those amounts made under the terms of the contract. The final statement will be titled The Final Estimate and will be the document utilized to document final payment to the Contractor. Receipt of

this document by the Contractor will begin the time frame for filing of a verified claim with the Department as provided for in G.S. 136-29 of the General Statutes of North Carolina.

In the instant case, the trial court determined that the 19 October 2001 letter and its accompanying documents were insufficient to be a final estimate. The trial court found that

Because of the improper heading, lack of signature or verification and small size of the check enclosed, Jones Bros.' regular procedures for handling final estimates were not initiated.

The trial court thereafter concluded that "[t]he document NCDOT sent to Jones Bros. on October 19, 2001 did not constitute the final estimate because it was improperly titled and was not signed or certified," and that "[b]ecause a properly titled and executed final estimate was not received by Jones Bros., the time for Jones Bros. to file a verified claim under N.C.G.S. § 136-29 has not run." We conclude that the trial court erred.

As indicated by the return of the certified mail receipt, Jones received NCDOT's 19 October 2001 letter on 24 October 2001. As detailed above, the letter was sent to Jones following an inquiry by Martin regarding the issuance of the final estimate. The subject line of the letter read "Payment of Final Estimate," and the letter stated that the "final estimate warrant" was attached and that the final estimate warrant represented the "final payment of the contract." The letter also stated that a copy of the "final estimate" was attached.

Estimate 40 was attached to the letter and was entitled "Contract Final Estimate." Estimate 40 stated that it was "The Final Estimate," and it indicated that the project was one hundred percent complete. Estimate 40 further indicated that $149,420.58 had been "Transferred to [Jones'] Trust Account" by the estimate.

Following receipt of the 19 October 2001 letter, Jones tendered the final pay warrant on 25 October 2001, and the Department of the State Treasurer paid the warrant. However, Jones failed to file a verified claim against NCDOT until 8 January 2002, seventy-six days after its receipt of the final estimate.

In his affidavit, Martin stated that "Janet Gibbs, the Jones Bros.' clerk responsible for the opening and directing of the mail at that time . . . processed [the final estimate warrant] as just another partial pay estimate because it was virtually identical to the previous

partial Project pay estimates." However, notwithstanding the requirement that the final statement be entitled "The Final Estimate," no provision contained within the Standard Specifications or Chapter 136 of the North Carolina General Statutes requires that the final statement follow a particular framework. In the instant case, Estimate 40 was entitled "Contract Final Estimate" and stated plainly that it was "The Final Estimate." The phrase "final estimate" was written five times within the cover letter and its accompanying documents. The documents were sent via certified mail and followed an inquiry from Jones regarding the status of the final estimate. We conclude that these documents satisfy the requirements of N.C. Gen. Stat. § 136-29 as well as the Standard Specifications, and thus qualify as a final estimate.

As noted above, the trial court considered the amount of the final pay warrant as a basis for its finding that Jones had not yet received a final estimate. The trial court agreed with Jones, who argued that the final estimate also should have included a check for $149,420.58, the amount due to Jones in retainage. However, this argument ignores the plain language of Estimate 40, which stated that the "Amount Transferred To Trust Account This Estimate" was $149,420.58. Contained within the record is the 1 October 2001 letter from NCDOT which authorized the trustee bank to transfer the remaining retainage to Jones. The letter specified the project number, stated that "[t]his project has been completed and the final estimate is being processed," and granted the bank the "authority to release to the Contractor the remaining amount in trust, which is $149,420.58." The following information appeared at the end of the letter:

cc-
Mr. Wayne Stallings
Jones Brothers, Incorporated

Although Jones contends that it did not receive a copy of this letter, Jones does not dispute that it received the funds authorized for release by the letter. In a letter to NCDOT dated 4 February 2002, Martin stated that "[o]n further investigation by our office we determined that the retainage which was released by your directive was carried by the Escrow Agent as a NCDOT Surry County project which, by coincidence, was closed out at roughly the same time." Although Jones contends that "[t]he fact that the retainage did not accompany Estimate 40 . . . added to the understanding that this was simply another estimate," as discussed above, no provision of the

Standard Specifications or Chapter 136 requires that the retainage payment accompany the final estimate. Estimate 40 was attached to a cover letter entitled "Payment of Final Estimate" and a pay warrant deemed the "final payment of the contract." Estimate 40 was entitled "Contract Final Estimate" and stated that the project was one hundred percent complete, while the other estimates stated different percentages of completion and were entitled "Contract Monthly Estimate." Thus, in light of the foregoing evidence, we conclude that the 19 October 2001 letter and its accompanying documents were sufficient to constitute a final estimate.

The trial court concluded in the alternative that "to the extent the document submitted on October 19, 2001 did constitute a final estimate . . . the failure of NCDOT to respond to Mr. Martin's December 21, 2001 e-mail equitably tolled the running of the statute of limitation[.]" In support of this conclusion, both the trial court and Jones cite *Reynolds Co. v. State Highway Commission*, 271 N.C. 40, 155 S.E.2d 473 (1967). We conclude that *Reynolds Co.* is distinguishable from the instant case.

In *Reynolds Co.*, the State Highway Commission first mailed to the plaintiff a final estimate and warrant, together with an accompanying letter characterizing the payment as "final payment of this contract." 271 N.C. at 42, 155 S.E.2d at 476. The plaintiff was concerned that acceptance of the payment would constitute a bar to liquidated damages claims, and therefore the plaintiff wrote the State Highway Commission a letter asking to modify the wording of the final estimate. In a response letter mailed several days later, the State Highway Commission complied with the plaintiff's requests. However, when the plaintiff filed suit following rejection of its verified complaint, the State Highway Commission moved to dismiss the suit for lack of subject matter jurisdiction, arguing that its first letter to the plaintiff triggered the sixty-day notice period and therefore the plaintiff's verified complaint was ten days late. On appeal from the trial court's order denying the motion to dismiss, this Court concluded that "[c]onsidering the facts in this particular case, it seems to us clear that defendant, by its letter written on 24 January 1964, voluntarily waived its rights to contend that plaintiff received its final estimate on 14 January 1964 when it received defendant's letter of 13 January 1964." *Id.* at 46, 155 S.E.2d at 478.

We conclude NCDOT did not waive its right to contend that Jones received the final estimate in the instant case on 24 October 2001. "Equitable estoppel arises when a party has been induced by

**A.H. BECK FOUND. CO. v. JONES BROS., INC.**

[166 N.C. App. 672 (2004)]

another's acts to believe that certain facts exist, and that party 'rightfully relies and acts upon that belief to his detriment.' " *Jordan v. Crew*, 125 N.C. App. 712, 720, 482 S.E.2d 735, 739 (quoting *Thompson v. Soles*, 299 N.C. 484, 487, 263 S.E.2d 599, 602 (1980)), *disc. review denied*, 346 N.C. 279, 487 S.E.2d 548 (1997). "In order for equitable estoppel to bar application of the statute of limitations, a plaintiff must have been induced to delay filing of the action by the misrepresentations of the defendant." *Id.* (citing *Duke University v. Stainback*, 320 N.C. 337, 341, 357 S.E.2d 690, 693 (1987)).

In the instant case, Jones has failed to demonstrate that NCDOT engaged in any affirmative acts requiring equitable relief. As discussed above, NCDOT's 19 October 2001 letter satisfied the requirements of N.C. Gen. Stat. § 136-29 and the Standard Specifications. Jones tendered the final pay warrant and admitted in affidavits that it failed to notice the release of the retainage. Although we recognize that NCDOT did not respond to Martin's email, we find no support for the conclusion that NCDOT's failure to respond to the email constituted an affirmative act or misrepresentation giving rise to an equitable defense. In his own email, Martin acknowledges that the message could reach NCDOT "at a bad time with the holidays and year end closing coming up[.]" Watts, the intended recipient of the email, stated in an affidavit that he "worked 2 hours and took 6 hours vacation" on 21 December 2001, and did not "recall receiving or reading any E-mail from Jones Brothers or its personnel[.]" Watts did not acknowledge receipt of the email or comment on its request prior to the running of the sixty-day notice period, and there is no indication that he acted in bad faith in connection with Jones' claim. Thus, we conclude that the doctrine of equitable estoppel does not apply in the instant case, and therefore the trial court should not have utilized equitable estoppel as an alternative ground to deny NCDOT's motion.

In light of the foregoing conclusions, we hold that the trial court erred in denying NCDOT's motion to dismiss Jones' complaint. The decision of the trial court is therefore reversed.

Reversed.

Chief Judge MARTIN and Judge HUDSON concur.