Eidogen-Sertanty, Inc. v. Univ. of N.C., 2018 NCBC 127.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| ORANGE COUNTY | 18 CVS 546 |
| EIDOGEN-SERTANTY, INC., | |
| Plaintiff, | |
| v. | |
| UNIVERSITY OF NORTH CAROLINA; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; and UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL d/b/a UNC ESHELMAN SCHOOL OF PHARMACY, | **ORDER AND OPINION ON DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

1.     Sovereign immunity is a doctrine that bars suits against the State and its agencies absent waiver or consent.  The question presented here is whether the State waived its sovereign immunity for claims of misappropriation of trade secrets.  For the following reasons, the answer is no.

> *James, McElroy & Diehl, P.A., by John R. Buric and John R. Brickley, for Plaintiff Eidogen-Sertanty, Inc.*
>
> *Robinson, Bradshaw & Hinson, P.A., by Cary B. Davis, Erik R. Zimmerman, and Morgan P. Abbott, for Defendants University of North Carolina, University of North Carolina at Chapel Hill, and University of North Carolina at Chapel Hill d/b/a UNC Eshelman School of Pharmacy.*

Conrad, Judge.

## I.
## BACKGROUND

2.     Plaintiff Eidogen-Sertanty, Inc. ("Eidogen") gathers and categorizes scientific information into databases designed for chemical, biological, and

pharmaceutical research. (Am. Compl. ¶ 10, ECF No. 17 ["Compl."].) One such database, the Kinase Knowledgebase, allows users to access hand-drawn chemical structures and associated biological annotations from among a collection of approximately two million data points. (Compl. ¶¶ 11, 12.) Eidogen grants access to the Kinase Knowledgebase to various organizations, including academic institutions, for annual license fees. (Compl. ¶¶ 19, 20.)

3. This case arises out of a license agreement between Eidogen and the University of North Carolina and its Eshelman School of Pharmacy (together, the "University"). (Compl. ¶ 18.) For $12,500 per year, certain University personnel were given user-specific, password-protected login credentials that allowed them to access and download information from the Kinase Knowledgebase for the limited purpose of using that information to conduct research. (Compl. ¶¶ 20, 24, 25.) The license agreement had an initial one-year term to be followed by automatic renewals each year unless the University provided written notice of cancellation at least ninety days before expiration. (Compl. ¶¶ 18, 21.) According to the amended complaint, the agreement renewed automatically for a second year and again for a third year, through December 22, 2018. (Compl. ¶¶ 26, 27.) But on January 24, 2018, the University informed Eidogen that, due to budget restrictions, it no longer wished to continue the services. (Compl. ¶¶ 28, 29.) Eidogen now asserts that the license agreement had already renewed and that the University is therefore obligated to pay the annual fee. (Compl. ¶¶ 27, 28, 30.) To date, the University has not paid the fee. (Compl. ¶ 30.)

4. Believing the University's non-payment to be in violation of the license agreement, Eidogen began to deactivate the University's login access. (Compl. ¶¶ 25, 31.) Eidogen claims to have discovered that the University improperly provided its credentials to outside users, and as a result, that the Kinase Knowledgebase was accessed beyond the scope of the agreement. (Compl. ¶¶ 32, 33, 35, 36.) Specifically, Eidogen alleges that the login credentials were used to enter other databases, to access information after the University indicated it did not want to renew, and to log in from unauthorized locations, not only in North Carolina but also elsewhere in the United States and abroad. (Compl. ¶¶ 32, 33.) The University allegedly continues to have access to information in the Kinase Knowledgebase. (Compl. ¶ 37.)

5. Eidogen filed this lawsuit in April 2018, claiming not only that the University breached the license agreement but also that it violated the North Carolina Trade Secrets Protection Act ("TSPA"). (Compl. ¶¶ 44, 54.) Eidogen alleges that the Kinase Knowledgebase is subject to trade-secret protection and that the University's ongoing access to and use of that information amounts to misappropriation. (Compl. ¶¶ 13–17, 23.)

6. The University has not yet answered the amended complaint but has moved to dismiss Eidogen's trade-secret claim, arguing that the claim is barred by sovereign immunity. (*See* Defs.' Mem. in Supp. 1, ECF No. 19 ["Mem. in Supp."].) Eidogen responds that the General Assembly waived sovereign immunity through the TSPA. (*See* Pl.'s Mem. in Opp'n 1, ECF No. 27 ["Opp'n"]; *see also* Compl. ¶ 61.) The Court

held a hearing on September 25, 2018, at which all parties were represented. The motion is ripe for determination.

## II.
## ANALYSIS

7.  Sovereign immunity protects the State and its agencies, including the University, "from suit absent waiver or consent." *Wood v. N.C. State Univ.*, 147 N.C. App. 336, 338, 556 S.E.2d 38, 40 (2001). A valid assertion of sovereign immunity is not merely a defense to liability; it is an "absolute and unqualified" immunity from suit altogether. *Guthrie v. N.C. State Ports Auth.*, 307 N.C. 522, 534, 299 S.E.2d 618, 625 (1983) (emphasis omitted). Thus, when a motion to dismiss is based on sovereign immunity, it must be decided as a threshold jurisdictional issue (though whether it "is a matter of personal or subject matter jurisdiction" remains unsettled). *Teachy v. Coble Dairies, Inc.*, 306 N.C. 324, 327–28, 293 S.E.2d 182, 184 (1982).

8.  The University's motion presents a single issue: whether the General Assembly waived sovereign immunity for claims of trade-secret misappropriation in the TSPA. That is a question of statutory interpretation and, therefore, a question of law for the Court to decide. *See, e.g.*, *Lunsford v. Mills*, 367 N.C. 618, 623, 766 S.E.2d 297, 301 (2014). It is also a question of first impression in North Carolina.

9.  Our Supreme Court has stressed that "[w]aiver of sovereign immunity may not be lightly inferred and State statutes waiving this immunity, being in derogation of the sovereign right to immunity, must be strictly construed." *Guthrie*, 307 N.C. at 537–38, 299 S.E.2d at 627. "The concept of sovereign immunity is so firmly established that it should not and cannot be waived by indirection or by procedural

rule. Any such change should be by plain, unmistakable mandate of the lawmaking body." *Orange Co. v. Heath*, 282 N.C. 292, 296, 192 S.E.2d 308, 310 (1972).

10. Applying these interpretive principles to the TSPA, the Court finds no plain and unmistakable waiver of sovereign immunity. The TSPA authorizes a private right of action for trade-secret misappropriation in just 18 words: "The owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret." N.C. Gen. Stat. § 66-153. This statute does not mention the State. Nor does it expressly permit the owner of a trade secret to bring a civil action for misappropriation against the State.

11. Even so, Eidogen infers a waiver of sovereign immunity from other sections of the TSPA. It points to section 66-155, which states that a prima facie case of misappropriation exists if there is evidence that "the person against whom relief is sought" had knowledge of the trade secret and an opportunity to acquire it without the owner's consent. *Id.* § 66-155. The term "person" is defined elsewhere to mean "an individual, corporation, *government, governmental subdivision or agency*, business trust, estate, trust, partnership, association, joint venture, or any other legal or commercial entity." *Id.* § 66-152(2) (emphasis added). Eidogen reads these statutes to allow trade-secret owners to sue the State because it is a "government" and, therefore, potentially a "person against whom relief" may be sought. (Opp'n 4–5.)

12. It would be particularly odd, though, to find a waiver of sovereign immunity in section 66-155. That statute has nothing to do with authorizing civil actions for

misappropriation (which is section 66-153's function). Its purpose is only to set out the standard that a trade-secret owner must satisfy to establish a prima facie case of misappropriation, along with the types of evidence a defendant may introduce to rebut the prima facie case. When section 66-155 refers to "the person against whom relief is sought," it does so in the context of allocating evidentiary burdens, not for the purpose of identifying who may be sued for misappropriation, as Eidogen contends.

13. The final sentence of section 66-155, which Eidogen does not address, confirms as much. It states that section 66-155 "shall not be construed to deprive the person against whom relief is sought of *any other defenses* provided under the law." N.C. Gen. Stat. § 66-155 (emphasis added). There is no obvious reason why this facially broad language would exclude defenses that immunize a defendant from suit, such as sovereign immunity. If so, then section 66-155 could not *waive* sovereign immunity because it *preserves* the defense. Thus, even accepting Eidogen's position that the State is a person under the TSPA, section 66-155 does not say or imply that the State may be sued for misappropriation.

14. Eidogen's argument also runs afoul of the usual rule that "the term person does not include the sovereign and statutes employing the word are ordinarily construed to exclude it." *N.C. Dep't of Transp. v. Davenport*, 334 N.C. 428, 432, 432 S.E.2d 303, 305 (1993) (citation, quotation marks, and alterations omitted) (holding that the State is immune from the contempt power of the court). Eidogen makes much of section 66-152(2)'s definition of person to include government, but when the General Assembly intends for the term government to include the State, it usually

says so expressly. *See, e.g.*, N.C. Gen. Stat. § 132-1(a) ("Agency of North Carolina government or its subdivisions shall mean and include every public office, public officer or official (State or local, elected or appointed)[.]"); *id.* § 53B-2(4) ("'Government authority' means an agency or department of the State or of any of its political subdivisions, including any officer, employee, or agent thereof."); *see also Davidson Co. v. City of High Point*, 85 N.C. App. 26, 37, 354 S.E.2d 280, 286 (1987) ("Normally, general statutes do not apply to the State unless the State is specifically mentioned therein.").

15.  The TSPA never mentions the State, either in its definition of person or anywhere else. This is in sharp contrast to other statutes our courts have construed to waive sovereign immunity because they clearly and directly refer to the State. *See, e.g.*, Tort Claims Act, N.C. Gen. Stat. § 143-291(a) (permitting certain negligence claims against "the State Board of Education, the Board of Transportation, and all other departments, institutions and agencies of the State"); *N.C. Ins. Guar. Ass'n v. Bd. of Trs. of Guilford Tech. Cmty. Coll.*, 364 N.C. 102, 108, 691 S.E.2d 694, 698 (2010) (finding waiver in Workers' Compensation Act, which provides that "[n]either the State nor any municipal corporation within the State . . . shall have the right to reject the provisions of this Article"); *Minneman v. Martin*, 114 N.C. App. 616, 619, 442 S.E.2d 564, 566 (1994) (finding "clear statutory waiver" in Whistleblower Act, which refers to "State department, agency or institution"); *State v. Taylor*, 322 N.C. 433, 435, 368 S.E.2d 601, 602 (1988) (finding waiver in section 41-10.1, which provides that "[an] individual . . . may bring an action . . . against the State").

16. Had the General Assembly intended to treat the State as a person within the TSPA and also to permit claims for misappropriation against the State, it could have said so expressly. It did neither. Thus, even if the General Assembly intended to authorize civil actions for misappropriation against some governments or governmental bodies (which is not at all clear), that authorization does not extend to the State.

17. In short, the TSPA does not clearly or unmistakably waive sovereign immunity for claims of trade-secret misappropriation. The University, as an agency of the State, is therefore immune from Eidogen's misappropriation claim, and that claim must be dismissed.

18. To be sure, this is a harsh result—one that may seem distasteful. It bears noting, though, that Eidogen is not without a remedy. The University concedes that Eidogen's claim for breach of contract is not barred by sovereign immunity because the State "implicitly consents to be sued for damages" when it enters into a contract. *Smith v. State*, 289 N.C. 303, 320, 222 S.E.2d 412, 423–24 (1976). And in other cases, parties alleging trade-secret misappropriation by the State may have alternative options for recovery. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002–04 (1984) (holding that if a plaintiff had a trade-secret property right under state law, the right is protected by the Fifth Amendment's Takings Clause). These may be imperfect substitutes for direct claims against the State for misappropriation, but in the absence of further action by the General Assembly, they will have to do.

### III.
### CONCLUSION

19. For these reasons, the Court **GRANTS** the University's motion to dismiss Eidogen's claim for misappropriation of trade secrets.

**SO ORDERED**, this the 11th day of December, 2018.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases